George J. EMERSHAW and Virginia D. Emershaw, Petitioners–Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.

No. 90–2055.

United States Court of Appeals, Sixth Circuit.

Argued May 3, 1991.

Decided Nov. 20, 1991.

Rehearing and Rehearing En Banc Denied Feb. 5, 1992.

Marc Dennis Teitelbaum, Richard P. Swanson (argued and briefed), Spengler, Carlson & Gubar, New York City, for petitioners-appellees.

Abraham N.M. Shashy, Jr., Chief Counsel, I.R.S., Office of Chief Counsel, Gary R. Allen, Acting Chief (briefed), Richard Farber, David M. Moore, Shirley D. Peterson, Brian C. Griffin (argued), Francis M. Allegra, U.S. Dept. of Justice Appellate Section Tax Div., Washington, D.C., for respondent-appellant.

Before KRUPANSKY and BOGGS, Circuit Judges, and COHN,* District Judge.

BOGGS, Circuit Judge.

George J. and Virginia D. Emershaw (the Emershaws), husband and wife, are partners in Leasing Equipment Associates–83 (LEA), a limited partnership organized for the purpose of purchasing and leasing computers and peripheral equipment. In 1983 and 1984, LEA suffered losses in the approximate amounts of $445,000 and $792,000, respectively. The Emershaws reported $37,801 and $66,654 as their distributive share of these losses on their 1983 and 1984 tax returns. The Commissioner of Internal Revenue disallowed the deductions and sent the Emershaws a statutory notice of deficiency for $3,752 for 1983 and $21,566.14 for 1984. The Commissioner also sought additions to tax, pursuant to 26 U.S.C. §§ 6653(a)(1)–(2) & 6661, and additional interest, pursuant to 26 U.S.C. § 6621(c).

The Emershaws subsequently petitioned the Tax Court for a redetermination of their taxes. The court held in their favor on all disputed points. This timely appeal by the Commissioner follows, pursuant to 26 U.S.C. § 7482. The Commissioner raises only one issue on appeal, whether the Emershaws were "at risk" within the meaning of 26 U.S.C. § 465, with respect to

---

* Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

their *pro rata* share of a "partial recourse promissory note" issued by LEA. Finding no error in the opinion of the Tax Court on this issue, we affirm the judgment below.

## I

This case involves the financial arrangements of a complex sale-leaseback transaction. We shall set forth the details of those arrangements only in so far as they are relevant to the issue now before the court.

There are three major parties to the sale-leaseback transaction: 1) CIS Leasing Corporation (CIS), which is a subsidiary of Continental Information Systems (Continental); 2) Program Leasing Corporation (Program); and 3) LEA, in which the Emershaws are limited partners. Continental is a substantial company engaged in the purchase and lease of computer equipment. It is listed on the New York Stock Exchange. CIS, however, is a shell. Program specializes in bringing together equipment leasing companies and limited partnerships, such as LEA, interested in investing in the computer leasing business.

Between September 9, 1982 and April 29, 1983, CIS made three separate purchases of computers and computer peripherals from the IBM Corporation. The aggregate cost of these purchases was $2,935,143, which CIS borrowed from a number of lending institutions. The lending institutions secured themselves by means of liens on the equipment and on the subsequent leases. After CIS purchased the equipment, it was leased to several different "end-users," who took possession of the equipment and used it in their businesses. The sale-leaseback transaction at issue in this case then ensued. CIS sold the equipment to Program as the first step in the transaction.

Pursuant to an agreement dated October 31, 1983, Program purchased the equipment from CIS for $3,030,300, subject to the existing end-user leases and the bank liens. Program paid $180,000 in cash on the date of the agreement. The balance of the purchase price, $2,850,300, was paid with a "full recourse installment promisso-ry note" bearing 6.9% interest through December 31, 1985 and 11% thereafter, until paid. This note was to become due in all events on October 31, 1998, but if Program received certain proceeds from its subsequent sale of the equipment, Program was obliged to make certain prepayments to CIS. Specifically, Program was obliged to pay CIS $248,300 as prepaid interest if it sold the equipment, monthly interest payments of $6,927.75 per month from November 1, 1983 through December 31, 1985, and monthly installments of principal and interest of $63,578.86 until October 31, 1990. The effect of these "prepayments" was to transform the "full recourse promissory note" into a kind of installment loan agreement if CIS should sell the equipment and receive installment payments itself. Of course, a sale of this sort and the subsequent acceleration of payment on the "full recourse promissory note" was a planned step in the full sale-leaseback transaction.

For this reason, the second step in the transaction was the sale of the equipment to LEA. By an agreement also dated October 31, 1983, LEA purchased the same equipment from Program for $3,030,300, subject to bank liens and the rights of existing leaseholders. LEA paid $79,200 in cash on the day of the purchase and issued a short-term promissory note for an additional $100,800. The remaining $2,850,300 was paid to Program by means of a "partial recourse secured promissory note," bearing 11% interest. Like the "full recourse installment promissory note" issued by Program to CIS, this note was payable in all events on October 31, 1998, but if LEA received fixed rent payments pursuant to its subsequent lease of the equipment, LEA was obligated to make prepayments to Program. Specifically, LEA was obligated to pay Program prepaid interest of $38,400 in cash and to deliver two full recourse promissory notes in the amounts of $230,400 each, due on April 30, 1984 and January 31, 1985 respectively. These notes also represented prepaid interest. LEA further agreed that if the equipment were leased, it would make monthly interest payments of $6,927.75 from November 1983

through December 1985 and monthly installments of principal and interest of $63,-578.86 thereafter until October 31, 1990. The partial recourse note specified further that LEA's recourse liability was limited to $1,818,182 plus the amounts owed pursuant to the short-term note and prepaid interest notes. As security, LEA agreed to grant Program a "purchase money security interest" in the equipment, all leases of the equipment, and all proceeds from the leases.

The third stage of this transaction was the "leaseback" of the equipment to CIS by LEA. Pursuant to a lease agreement also dated October 31, 1983, LEA leased the equipment back to CIS, subject to the bank liens, the lease rights of the end-users, and Program's security interest. The lease provided for fixed rent of $6,927.75 per month through December 1985, and $63,-578.86 per month thereafter through October 1990. The lease agreement also entitled LEA to a portion of the rent to be received by CIS from end-users. Specifically, LEA was entitled to 25% of the adjusted gross rents derived from some of the equipment after the bank lien against it had been satisfied and through December 31, 1987. In addition, the lease entitled LEA to 60% of the adjusted gross rents derived from all of the equipment after January 1, 1988. Adjusted gross rents are the amounts paid by the end-users, less storage and refurbishing costs associated with the leasing of the equipment.

The final stage in the transaction consisted of arrangements for the payment of the fixed rents and note payments. Continental, CIS's parent, guaranteed CIS's rent obligation to LEA. In addition, by letter dated October 31, 1983, LEA directed CIS to pay the fixed rent payments due to LEA under the lease directly to Program. These payments were to satisfy LEA's installment payment obligations under the partial recourse note LEA issued to Program when LEA bought the computer equipment. By letter of the same date, Program directed CIS to apply the rent payments Program would receive from LEA (by way of CIS) against the installment note Program had issued to CIS when Program bought the equipment.

The effect of this transaction was to set up a round-robin of payments among the three entities party to it. After all the cash payments and short-term notes were exchanged, Program owed CIS $2,850,300 on a full recourse promissory note, and LEA owed Program the same amount on a partial recourse promissory note. CIS owed LEA rent. The monthly rental was exactly equal to the amount Program owed CIS and LEA owed Program. Each month, CIS would "pay" its rent by "forwarding" to Program the sum otherwise due to LEA, in satisfaction of LEA's monthly obligation on its note to Program. Program would then apply the amount thus "forwarded" to CIS to satisfy Program's monthly obligation on its note to CIS. CIS used this sum to pay the rent, thereby closing the circle of payments. Of course, no cash actually changed hands. All "payments" were bookkeeping transactions.

The Emershaws enter the picture on October 14, 1983, when they purchased a 7.57% interest in LEA. They paid $12,000 in cash and issued promissory notes in the amounts of $17,600 and $25,000, due on April 30, 1984 and January 31, 1985 respectively. In addition, the Emershaws agreed to assume their *pro rata* share of LEA's indebtedness to Program on the partial recourse note to the extent that the share did not exceed $137,550 plus interest due thereon. Because of the nature of the sale-leaseback transaction detailed above, the Commissioner claims that the Emershaws are not "at risk" within the meaning of 26 U.S.C. § 465 with respect to their *pro rata* share of LEA's liability under the partial recourse note issued to Program. The Commissioner maintains that the circular nature of the obligations of LEA, Program, and CIS protects the Emershaws from any realistic possibility that they would ever be required to make any payment towards LEA's liability on the partial recourse note.

II

A taxpayer engaged in an activity to which § 465 applies is allowed to deduct

losses occasioned by such activity only to the extent to which the taxpayer is "at risk" for such activity. 26 U.S.C. § 465(a). Equipment leasing such as that involved in this case comes within the terms of the statute. *Id.* § 465(c)(1)(C). A taxpayer is "at risk" for amounts of money and the adjusted basis of property contributed to an activity. *Id.* § 465(b)(1). A taxpayer is also at risk for amounts of money borrowed for use in the activity to the extent that the taxpayer is personally liable for repayment of the loan. *Id.* § 465(b)(2). A taxpayer is not considered "at risk" for "amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." *Id.* § 465(b)(4).

According to the Tax Court, the issue of whether a taxpayer is "at risk" for purposes of 26 U.S.C. § 465(b)(4) "must be resolved on the basis of who realistically will be the payor of last resort if the transaction goes sour and the secured property associated with the transaction is not adequate to pay off the debt." *Levy v. Commissioner*, 91 T.C. 838, 869 (1988). The court determined that LEA was the payor of last resort by assuming a "worst case scenario" for purposes of analysis. In this scenario, CIS would go bankrupt, renounce its lease, and stop making rent payments to LEA. Although LEA would have a claim for damages against CIS in such circumstances, the LEA partners, including the Emershaws, would still be required to pay Program the balance of the partial recourse note on October 31, 1998. (If CIS stops paying rent, the prepayment provisions of the partial recourse note, which is the source of LEA's obligation to pay monthly installments to Program, would no longer be operative). For this reason, the Tax Court determined that LEA, and therewith the Emershaws, was "at risk" for invested sums represented by the partial recourse note issued to Program.

The Commissioner relies on the majority opinion in *Baldwin v. United States*, 904 F.2d 477 (9th Cir.1990), and on *Moser v. Commissioner*, 914 F.2d 1040 (8th Cir. 1990) to oppose this result. According to the Commissioner, the facts of *Baldwin*, which involved a three-party sale and leaseback of computer equipment, are exactly analogous to this case. The Emershaws do not dispute this assertion, and we accept it as true. The Commissioner argues that the circular, off-setting nature of the obligations of LEA, Program, and CIS protects the Emershaws from any realistic possibility that they would ever be required to make payments to satisfy LEA's liability on the partial recourse note. Therefore, the Commissioner maintains, the sale-leaseback transaction at issue in this case provides loss-limiting "arrangements" for the benefit of the Emershaws and other LEA partners, thereby taking their investment out of the "at risk" category for § 465 purposes. *See* 26 U.S.C. § 465(b)(4) (taxpayer not considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or *other similar arrangements* (emphasis supplied)).

The Commissioner, influenced by the *Baldwin* majority, urges this court to reject the Tax Court's worst-case scenario analysis and adopt economic reality, the ever-elusive *terra firma* of the tax code, as the standard for determining whether the Emershaws' investment is "at risk." *See Baldwin*, 904 F.2d at 483. According to the Commissioner, it is irrelevant in terms of economic reality that CIS may become insolvent, thereby requiring the Emershaws and other LEA partners to satisfy their obligations on the partial recourse note out of funds other than rent receipts. The *Baldwin* majority supplied the reasoning the Commissioner relies on for this argument. That reasoning is based on the majority's interpretation of the Congressional intention in passing 26 U.S.C. § 465(b)(4) as expressed in the Senate Report recommending the subsection for passage. According to the *Baldwin* majority,

[T]he legislative history of subsection 465(b)(4) shows that Congress intended to exclude the possibility that financial difficulty would prevent a guarantor from reimbursing a taxpayer for a loss from the subsection 465(b)(4) calculus:

For purposes of [subsection 465(b)(4)], it will be assumed that a loss-protection guarantee, repurchase agreement or insurance policy will be fully honored and that the amounts due thereunder will be fully paid to the taxpayer. The possibility that the party making the guarantee to the taxpayer, or that a partnership which agrees to repurchase a partner's interest at an agreed price, will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement.

904 F.2d at 482 (quoting S.Rep. No. 938, 94th Cong., 2d Sess. 50 n. 6 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 2897, 3439, 3486 n. 6).

On the basis of this passage from the legislative history, the *Baldwin* majority concluded that a round-robin structure of payments in a sale-leaseback transaction like the one in this case was sufficient to take the investment of the limited partners out of the "at risk" category, notwithstanding the possibility that a party to the transaction might become insolvent. According to the *Baldwin* majority,

the purpose of subsection 465(b)(4) is to suspend at risk treatment where a transaction is structured—by whatever method—to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable. A theoretical possibility[, such as the bankruptcy of one of the parties to the transaction,] that the taxpayer will suffer economic loss is insufficient to avoid the applicability of this subsection. We must be guided by economic reality. If at some future date the unexpected occurs and the taxpayer does suffer a loss, or a realistic possibility develops that the taxpayer will suffer a loss, the taxpayer will at that time become at risk and be able to take the

deductions for previous years that were suspended under this subsection.

904 F.2d at 483. (Citations omitted.)

We see economic reality and the Congressional intent behind § 465 differently from the *Baldwin* majority and the Commissioner. Two examples will serve to make our perspective clear.

The first example illustrates an abusive tax shelter of the sort the "at risk" rules of § 465 were intended to address. In this example, the taxpayer buys an apartment building for $100,000. He finances the purchase by agreeing to pay the owner $10,000 as a down payment. The remaining $90,000 he pays with a ten-year, 10% nonrecourse note. By its terms, he is required to pay the owner $9,000 per year in interest only for ten years, and at the end of the ten years, to pay in full the outstanding principal, $90,000. The taxpayer then leases the building for $9,000 to a large corporation, *e.g.* General Motors, to be used as housing for relocated executives. This rent payment will cover the interest our taxpayer owes to the building's former owner. At the end of the ten years, the taxpayer plans to walk away from the purchase and permit the former owner to repossess the building. In the meantime, he plans to deduct the building's depreciation from his gross income and to take additional deductions for the costs of operating the building over and above the $9,000 in interest payments he must make each year to the former owner.

Our second example is a legitimate transaction, although one structured to take advantage of the tax code. In this case, our taxpayer also purchases an apartment building for $100,000, paying $10,000 down. He borrows the remaining $90,000 from a bank on a ten-year, 10% full recourse note secured by a mortgage. According to the note's terms, the taxpayer must pay $9,000 per year in interest on the note and he must make payments to amortize the principal. The taxpayer then leases the building for his yearly note obligation to a deep-pockets corporation, thereby assuring that he will have a sufficient influx of cash to meet his annual obligations to the bank.

Our taxpayer plans to deduct from his gross income the operating costs of the building not covered by the corporation's rent payment and to depreciate the building fully over the ten-year life of the note.[1] At the end of the ten years, he will own the building free and clear, will have had no out-of-pocket expenses except his down payment and the yearly operating costs, and he will have had the advantage of considerable tax savings.

As it happens, events do not turn out well for our second taxpayer. At the end of the third year of this arrangement, the corporate lessee becomes insolvent, cancels its executive relocation program, and declines to renew the lease. The taxpayer is left without the means to pay the bank and defaults on his note. The bank forecloses on the property, which has depreciated $30,000 over the previous three years. As a result, only $60,000 are realized when the property is sold. Our unfortunate taxpayer is personally liable for the $30,000 deficiency.

In both examples, the taxpayer has taken steps to minimize his initial outlays of cash through credit arrangements. In both examples, the taxpayer has further minimized potential cash flow problems by arranging that income from his investment will cover the obligations he has incurred in making the investment. If the first example is an illegitimate tax avoidance scheme and the second a legitimate investment for tax purposes, it is not the credit arrangements, which minimize the need for cash, that make them so. The difference between the two examples is that the first transaction is not really an investment in economic terms. The second is. The "at risk" rules of § 465 attempt to distinguish between the two.

The tax code levies its exactions on "gross income," but the code also recognizes the fact that it takes money to make money, *i.e.*, to produce gross income. For this reason, when a taxpayer invests, *i.e.*,

when he commits resources in order to produce income, he may deduct some of the costs of producing that money from gross income. When the investment does not produce income but loses money instead, the taxpayer is permitted to deduct those losses. The "at risk" rules of § 465 attempt to distinguish between legitimate investments and transactions whose purpose is merely to take advantage of permitted deductions.[2] A legitimate investment is one in which the taxpayer risks value presently at his disposal in order to create increased value in the future. If the taxpayer's investment turns out to be profitable, he recovers the value he initially committed plus the increase, on which he pays tax. This tax, in terms of economic reality, is the government's share in the profits from the investment. If the investment goes sour, the taxpayer makes no profit and may lose part of the value he initially committed. He is permitted to take a deduction, which, in terms of economic reality, is the government's share of the loss.

In our examples, the investment of the second taxpayer is legitimate for tax purposes because he has committed value to the transaction in the hope of one day owning the apartment building free and clear and collecting the rents thereon without the need to make payments to a lender. He also stands to lose if the investment fails, *i.e.*, if his deep-pockets lessee defaults on the rents. In that case, he will lose part of the value he has committed to the investment. This value is the cash he used for his down payment and his credit, which he encumbered to the extent of $90,000 when he borrowed from the bank. According to § 465, he is "at risk" for the full $100,000. 26 U.S.C. § 465(b)(1) & (2) (a taxpayer is at risk for money contributed to an activity and for amounts borrowed with respect to the activity and for which the taxpayer is personally liable). In other words, his investment is legitimate for tax purposes be-

---

1. This may not be possible under the tax laws at present, but that fact, if it is a fact, is not relevant to our example.

2. Of course, this statute does not separate every legitimate transaction, as we define legitimacy

for present purposes, from every illegitimate one. The statute is the product of a continuing legislative compromise between those who seek to restrict tax shelters and those who wish to take advantage of them.

cause he not only stands to gain on his investment but also to lose his investment. This is because he put up $10,000 of his own money and engaged his credit for the remaining $90,000 and is personally liable for the latter amount.

By contrast, the taxpayer in the first example has committed only $10,000 to the transaction. This is the only amount he can lose on the transaction. For that reason, he is "at risk" with respect to the $10,000 only. With respect to the $90,000 he borrowed from the bank, he will neither gain nor lose. When, as he plans, he walks away from the transaction without paying the outstanding principal on his note, he will not be personally liable for that sum. The purpose of the transaction is not to create future value by committing resources presently at the taxpayer's command. The sole purpose of the transaction is tax avoidance.

The illegitimacy of the transaction in the first example stems from the use of nonrecourse financing. The tax code specifically provides that a taxpayer is not "at risk," with respect to amounts borrowed on nonrecourse instruments. *Id.* § 465(b)(4). Besides nonrecourse financing, there are innumerable other devices that taxpayers might use to achieve what the nonrecourse note in our first example effected. Among them are the arrangements mentioned in the passage from the Senate Report quoted by the *Baldwin* majority. Nonetheless, we are not persuaded by the *Baldwin* majority's application of the legislative history of § 465(b)(4) to a transaction of the sort now before this court, and we decline to follow the *Baldwin* majority's holding. In our judgment, the position taken by the *Baldwin* dissent represents the better reasoned view. *See Baldwin,* 904 F.2d at 483–87 (Hug, J., dissenting).

The *Baldwin* majority apparently sees the Emershaws' transaction as fitting the pattern of the first example we elaborated above. We think that the second example is the closer fit. We do not consider the circular, off-setting group of obligations established by the sale-leaseback transaction at issue here to be, by itself, a loss-

limiting arrangement within the meaning of § 465(b)(4). The structure of the obligations of the parties to this transaction does not seem to be a loss-limiting device of any sort. The parties have arranged their transaction to minimize the need for the LEA partners to provide a great deal of cash "up front" in order to participate in the purchase and leasing of computer equipment. Nonetheless, if CIS becomes insolvent because the end-users stop paying rent or for some other reason, the Emershaws and other LEA partners will be called on to satisfy the terms of the partial recourse note. Therefore, their investment is at risk. Consistent with the *Baldwin* dissent, we reject the interpretation of the legislative history of § 465(b)(4) that leads to the opposite conclusion. We see no reason for dismissing the possible bankruptcy of CIS as a mere theoretical possibility. In fact, it has already occurred, as we learned during oral argument.

In addition to the passage quoted by the *Baldwin* court from the legislative history of 26 U.S.C. § 465(b)(4), the Senate Report also contained the following explanation of the "at risk" concept.

A taxpayer's capital is not "at risk" in the business, even as to the equity capital which he has contributed to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss *after the loss is sustained,* or if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement *between himself and another person.*

. . . .

[For example,] in some livestock breeding investments carried on through a limited partnership, the partnership agrees with a limited partner that, at the partner's election, it will repurchase his partnership interest at a stated minimum dollar amount (usually less than the investor's original capital contribution). In

situations of this kind, the partner is to be considered "at risk" only to the extent of the portion of the amount otherwise at risk over and above the guaranteed purchase price.

Similarly, if a taxpayer is personally liable on a mortgage but he separately obtains insurance to compensate him for any payments which he must actually make under such personal liability, the taxpayer is at risk only to the extent of the uninsured portion of the personal liability to which he is exposed.

S.Rep. No. 938, *supra,* 1976 U.S.Code Cong. & Admin.News at 3485 (emphasis supplied) (quoted in part in *Baldwin,* 904 F.2d at 486 (Hug, J., dissenting)).

▮ We agree with the conclusion of the *Baldwin* dissent that these passages indicate that a loss-limiting arrangement within the meaning of § 465(b)(4) is a *collateral agreement* protecting a taxpayer from loss *after the losses have occurred,* either by excusing him from his obligation to make good on losses or by compensating him for losses he has sustained. *Baldwin,* 904 F.2d at 487 (Hug, J., dissenting). Once the taxpayer has entered into such an arrangement, it is improper to inquire into the solvency of the insurer or guarantor in determining whether the taxpayer's investment is "at risk." *Id.* at 486. This is the significance of the passage above quoted by the *Baldwin* majority from the legislative history of § 465(b)(4). That passage states that the solvency of a guarantor or insurer is irrelevant in determining whether a taxpayer's capital is at risk. The *Baldwin* majority and the Commissioner have interpreted the passage by reading it as if it referred to the insolvency of any party to an investment transaction. We think this incorrect. In the main, the passage speaks of collateral agreements. Even when the passage presents a hypothetical case in which one limited partner buys out another in order to protect the latter from loss, such an arrangement must be considered in the nature of a collateral guarantee.

In terms of the two hypothetical cases that we developed above as examples, the Commissioner and the *Baldwin* majority are seizing on the fact that both of our hypothetical taxpayers minimized any potential cash flow problems by leasing their property to a deep-pockets lessee whose annual rents matched the taxpayer's annual interest payments. An arrangement of this sort is not relevant to the issue before the court. It is one thing to minimize the risk of a cash flow crisis; it is another thing to use collateral arrangements to protect oneself from the loss of a nominal investment.

We see no reason to extend the logic of the passage from the Senate Report quoted by the *Baldwin* majority beyond its explicit discussion of the effect of a collateral arrangement on the "at risk" status of an investment. For a taxpayer, the potential insolvency of a company on which an investment depends is the critical risk affecting an investment decision. The Emershaws have invested, albeit indirectly, in CIS. The risk they have assumed is that CIS will fail. As the *Baldwin* dissent astutely suggests, they are in the position of an investor who buys rental property with a bank loan and then rents the property out for a sum equal to his monthly installment on the loan. In other words, they are in the position of the taxpayer in our second example. If such a transaction were within the terms of § 465, no one would argue that the investor was not at risk for the amount he had borrowed, even though he is "protected" as long as the lessee pays, and even though the lessee is creditworthy. If the lessee defaults on the rent, the investor must still make payments on the note.

In this case, the Commissioner has presented no collateral agreement that would relieve the Emershaws of their obligations under LEA's partial recourse note should CIS stop paying rent or that would satisfy the Emershaws' obligations for them. For this reason, we hold that they were "at risk" within the meaning of 26 U.S.C. § 465 for their *pro rata* share of LEA's partial recourse note.

Continental's guarantee of CIS's rent payments to LEA is, of course, a collateral arrangement, but it does not relieve LEA

of the obligation to pay on the partial recourse note if the investment goes sour. Continental may go bankrupt itself, or it may refuse to honor the guarantee. In that case, LEA, and therewith the Emershaws, would still be liable on the partial recourse note. The only relevant effect of Continental's guarantee is that it makes more remote the actual prospect that the circle of offsetting obligations and payments will be interrupted. Nonetheless, LEA and its partners, including the Emershaws, remain "the payor[s] of last resort."

The Commissioner's brief makes it clear that what he finds most unsettling about the sale-leaseback transaction in this case is the circle of off-setting obligations and payments and the fact that the payments are made by bookkeeping entries. The *Baldwin* majority argues that in such a case there is no realistic possibility that a party in the position of LEA would suffer any economic loss if the transaction turned out unprofitable, because all three parties lacked the independent means to pay their obligations.[3] *See Baldwin*, 904 F.2d at 483. Therefore, the *Baldwin* majority said, they satisfied them by means of offsetting bookkeeping entries. Since none of them has independent means, none has any interest in disrupting the circle of payments by demanding cash from the others or withholding its own fictitious payments.

In this case, the Commissioner asserts that LEA had no independent means to satisfy any of its obligations other than the rental payments from CIS, which it received in the form of bookkeeping entries.[4] He concedes that he does not know if Program and CIS were in the same position. Nonetheless, he concludes, as the *Baldwin* majority did, that because of the circle of off-setting obligations, the Emershaw are

not "at risk," because there is no "realistic possibility that the taxpayer will suffer any out-of-pocket loss if the transaction is unsuccessful." *Brief for the Appellant*, at 20 (citing *Baldwin*, 904 F.2d at 483).

We are at a loss to understand this argument. Another example will illustrate our perplexity. Let us imagine that instead of using a system of off-setting bookkeeping entries, the three entities in this transaction paid each other by check. CIS would write a check to LEA for the rent. LEA would endorse the check over to Program as payment on its installment note. Finally, Program would endorse the same check over to CIS as payment on its note. We do not see how such an arrangement is essentially different from a sequence of off-setting bookkeeping transactions. We further do not see how either arrangement exempts the transaction from risk. Ultimately, the end-users of the computers and the equipment in this case must come up with cash to pay CIS so that it can pay IBM. If this does not occur, CIS becomes insolvent; the investment goes sour; and the LEA partners are called upon to pay on the partnership's note.

The structure of the transaction in this case minimizes the need for a large initial cash outlay by any of the LEA partners. It does not minimize the risk that "the taxpayer will suffer any out-of-pocket loss if the transaction is unsuccessful." That risk depends on whether or not CIS loses its end-user leases and becomes bankrupt. If it does, the LEA partners will be called on to pay their share of LEA's obligations to Program. The circle of off-setting obligations does nothing to affect this risk, let alone eliminate it, realistically, probably, or otherwise. It is true, as the Commissioner

---

3. We point out that this argument is inconsistent with the position of the *Baldwin* majority that the limited partners in that case would be "at risk" if the entity in *Baldwin* analogous to CIS in this case becomes insolvent. At one point we are told that there is *"no realistic possibility"* that the limited partners would suffer any economic loss because of the off-setting obligations. At another point, we are told that the hypothetical bankruptcy of the CIS analogue, should it materialize, will put the limited investors at risk because, one must assume,

there is a *realistic possibility*, even in the court's own view, that they will suffer economic loss.

4. This statement is rather misleading. As long as payments came in from CIS, LEA had no need for independent means to satisfy its obligations. If rent were to stop, it would be obligated to pay the partial recourse note in October 1998. At that time it could call on the resources of its limited partners for that purpose.

 

contends, that none of the entities that are party to this transaction have an incentive to demand cash from any other entity. Neither do they have an incentive to introduce cash payments into the circle of offsetting obligations by selling any of the promissory notes in the transaction. We do not see the relevance of these facts. Plainly, this sale-leaseback was structured so as to avoid the need for investors to commit large sums of cash to it. As a result, they have little *cash* "at risk" in this transaction, but the tax code makes it quite clear that an investor is "at risk" not only for the cash contributed to an activity but for "amounts borrowed with respect to such activity ... for which he is personally liable." 26 U.S.C. § 465(b)(1)(B) & (b)(2)(A). In other words, the tax code recognizes that a taxpayer may invest not only cash but also credit. When the Commissioner asserts that LEA has no "independent means" to satisfy its obligations, he can only mean that it has no present cash income. He is ignoring the fact that the LEA partners, including the Emershaws, have invested their credit in this transaction and that LEA can call on them to pay its note to Program. At that time, they will have to come up with cash. For this reason, the LEA partners are the "payors of last resort," and they are "at risk" in this transaction for sums represented by the partial recourse note LEA issued to Program.

For the foregoing reasons, the judgment of the Tax Court is AFFIRMED.

COHN, District Judge, dissenting.

I dissent. No useful purpose will be served by any extended discussion of my reasons for my disagreement with the majority opinion. It is sufficient for me to say that Section 465's "at risk" requirement looks to a realistic possibility that the taxpayer may be required to make good on the partial recourse note involved here. The majority's rather elaborate analysis does not persuade me that is the situation here. *Baldwin v. United States*, 904 F.2d 477 (9th Cir.1990), supports my conclusion. In short, the circular sale-leaseback transaction at issue in this case removed any realistic possibility that the investors would suffer an economic loss.