Curtis and Patsy OWENS, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Bobby A. LEACH, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 3–91–0117, 3–91–0232.

United States District Court,
E.D. Tennessee,
at Knoxville.

Jan. 21, 1993.

Robert J. Marquis, J. Christopher Kirk, Gregory Erickson, McCampbell & Young, P.C., Knoxville, TN, for plaintiffs.

Michael J. Martineau, Tax Div., U.S. Dept. of Justice, Washington, DC, for defendant.

MEMORANDUM OPINION

JARVIS, Chief Judge.

These are two tax refund cases brought pursuant to 28 U.S.C. §§ 1346(a)(1). The facts are stipulated and cross-motions for

summary judgment are pending. The relevant facts are identical and raise the same issue: whether the plaintiff taxpayers were "at risk" within the meaning of § 465 of the Internal Revenue Code with respect to their *pro rata* share of a partial recourse promissory note. Because I conclude that they were not, defendant's motions for summary judgment will be granted, plaintiffs' motions denied, and these actions dismissed.

## I.

### Stipulated Facts

1. This is a tax refund action in which the plaintiffs, Curtis and Patsy Owens, and the plaintiff, Bobby Leach, seek a refund of federal income taxes and interest allegedly erroneously assessed and collected by the Internal Revenue Service from the plaintiffs.

2. The plaintiffs, Curtis Owens and Patsy Owens, seek a refund of federal income taxes and interest in the amount of $154,115 allegedly erroneously assessed and collected by the Internal Revenue Service (IRS) arising out of the IRS' disallowance of losses claimed by plaintiffs on their joint federal income tax return for the year 1977 generated by their participation in the Picasso and Beta partnerships.

3. The plaintiff, Bobby Leach, seeks a refund of federal income taxes and interest in the amounts of $47,004, and $25,000, or a total amount of $72,004, allegedly erroneously assessed and collected by the IRS arising out of the IRS' disallowance of losses claimed by plaintiff on his federal income tax returns for the years 1976 and 1977, respectively, generated by his participation in the Picasso and Beta partnerships.

A. Background.

4. Plaintiffs became limited partners in two (2) equipment leasing partnerships, Picasso Equipment Associates and Beta Leasing Associates, in 1976. Each partnership was involved in a series of transactions designed to finance the acquisitions of IBM 370/158 computers which were ultimately leased, on a long-term basis, to non-profit insurance companies unrelated to the partnerships.

5. Both of the partnerships were activities engaged in for profit within the meaning of § 183 of the Internal Revenue Code of 1954, as amended (the "Code") (The 1954 Code, rather than the 1986 Code is controlling for purposes of this case). The plaintiffs had both a subjectively and objectively reasonable expectation of profit from their involvement with the partnerships.

6. All of the transactions related to the purchase and lease of the computers did, in fact, occur, and all payments required pursuant to the respective terms of these transactions were made in a timely manner.

7. For purposes of this action, the parties stipulate and agree that, inasmuch as the structure of the transactions involving the Picasso partnership is identical in all material respects to the structure of the transactions involving the Beta partnership, except for the amounts involved in such transactions, the court's ruling regarding the transactions involving the Picasso partnership is binding upon the transactions involving the Beta partnership.

B. Picasso.

### Original Purchase Transaction and End–User Lease

8. On May 11, 1976, OPM Leasing Service, Inc. (OPM), an equipment leasing corporation organized under the laws of the State of New York, acquired an International Business Machines (IBM) 370/158 computer and certain related computer equipment (hereinafter collectively referred to as the "computer equipment").

9. Simultaneous with its acquisition of the computer equipment, OPM leased the computer equipment to Blue Cross Hospital Services, Inc. of Missouri, a non-profit insurance company organized under the laws of the State of Maryland to furnish medical and hospital insurance to subscribers (the "Blue Cross Lease") for a term of seven (7) years.

10. OPM financed its acquisition of the computer equipment in part through the First Jersey National Bank ("First Jersey"), executing a seven (7) year promissory note (the "First Jersey Note") also dated May 11, 1976, payable in monthly installments approximately equal to the rental payments under the Blue Cross Lease.

11. On December 15, 1976, OPM secured additional financing through National Bank

of North America, executing a six (6) year promissory note (the "NBNA Note") and granting NBNA a security interest (the "NBNA Security Agreement") to the extent of the value of the NBNA Note, in the computer equipment and the Blue Cross Lease.

## C. Purchase by Picasso and Related Transactions

12. On December 31, 1976, there were three (3) additional and essentially simultaneous transactions involving the computer equipment and the Blue Cross Lease which had the net effect of transferring the ownership of the computer equipment and assigning the Blue Cross Lease to Picasso Equipment Associates ("Picasso"), the equipment leasing partnership in which the plaintiffs invested and through which the plaintiffs claim the losses at issue in this case.

13. First, OPM sold the computer equipment and assigned its interest in the Blue Cross Lease to OPM Leasing Services, Inc./ Picwun ("Picwun"), a wholly owned subsidiary of OPM. The "sale" of the computer equipment by OPM to Picwun was, in reality, a capital contribution within the meaning of § 318 of the Code. Picwun also assumed the obligations of OPM with respect to the NBNA Security Agreement.

14. The sale of the computer equipment and assignment of the Blue Cross Lease to Picwun was followed by the immediate resale of the computer equipment and reassignment of the Blue Cross Lease to OPM Leasing Services, Inc./Pictoo ("Pictoo"), also a wholly owned subsidiary of OPM, for an amount approximately equal to the original purchase price of the computer equipment. The purchase price was paid in part in a small cash payment, with the balance in a non-recourse promissory note. In addition, Pictoo assumed the obligations which Picwun had previously assumed under the NBNA Security Agreement and granted Picwun a security interest, to the extent of the value of the Pictoo Note, in the computer equipment and the Blue Cross Lease.

15. The sale of the computer equipment and reassignment of the Blue Cross Lease to Pictoo was followed immediately by the resale of the computer equipment and reassignment of the Blue Cross Lease to Picasso, for an amount approximately equal to Pictoo's purchase price for the computer equipment. The purchase price was paid in part in a small cash payment, with the balance in a limited recourse promissory note. In addition, Picasso assumed the obligations of Pictoo under the NBNA Security Agreement and granted Pictoo a security agreement to the extent of the value of the Picasso Note in the computer equipment and the Blue Cross Lease.

16. In a pre-arranged transaction, Picasso then leased the computer equipment back to Picwun (the "Picasso Lease") for a term of ten (10) years and one (1) day. Under the terms of the Picasso Lease, Picwun was to make monthly rental payments to Picasso in an amount approximately equal to Picasso's obligation to Pictoo under the Picasso Note.

17. In order to induce Picasso to enter into the purchase and lease transactions with Pictoo and Picwun, respectively, both Pictoo and OPM unconditionally, and on a full recourse basis, guaranteed Picasso and its limited partners the full performance of all obligations of Picwun under the Picasso Lease.

18. A chart depicting the transactions at issue is as follows:

(1) Lease is guaranteed by Seller and OPM. User Lease is collaterally assigned to secure performance of Lease, subject to Bank Lien.

D. Investments in Picasso and Losses Claimed

19. Picasso was an equipment leasing limited partnership organized under the laws of the District of Columbia. Its general partners and one percent (1%) owners, respectively, were Topspin Data Corporation and Kent M. Klineman. The plaintiffs became limited partners on December 31, 1976 upon the execution of Subscription Agreements obligating them to contribute $60,000.00 to Picasso. The plaintiffs each immediately contributed $24,000.00 and executed promissory notes to Picasso payable on July 1, 1977 for the remaining balance, or $36,000.00, together with interest thereon at the rate of 8% per annum.

20. Under the terms of the Picasso partnership agreement, each limited partner was personally and on a limited recourse basis liable on the Picasso Note to Pictoo to the extent of 267% of the limited partners' total capital contribution to the partnership. Under this provision, limited partners such as the plaintiffs were subject to a potential liability of $160,200.00 in the event that the other parties to this series of transactions were to default on their obligations. The extent of the personal liability of the limited partners on the Picasso Note to Pictoo was subject to a temporal limitation defined in the Picasso partnership agreement as the "User Rent Achievement Date." The User Rent Achievement Date is described as either the date by which the Blue Cross Lease rental payment received by Picasso exceeded $595,970.00, or February 28, 1978, whichever occurred first. After such date, the recourse liability of the Picasso limited partners on the Picasso Note would be extinguished.

21. The plaintiffs, Curtis Owens and Patsy Owens, claimed losses from the Picasso and Beta partnerships in the amounts of $97,318.00 and $64,879.00, respectively, on their joint federal income tax return for the year 1977. The IRS disallowed the losses claimed by the plaintiffs from the Picasso and Beta partnerships. The plaintiffs paid over to the IRS the amount of $154,000.00, in

full satisfaction of the federal income tax and deficiency interest due and owing the IRS by plaintiffs attributed to the IRS' disallowance of the partnership losses. The plaintiffs timely filed a claim for refund with the IRS. As of this date the IRS has taken no action with respect to the claim for refund.

22. Plaintiff Bobby Leach claimed losses from the Picasso and Beta partnerships in amounts of $66,706.00 and $44,471.00, respectively, on his federal income tax return for the year 1976. The Internal Revenue Service disallowed the losses claim by plaintiff arising out of the Picasso and Beta partnerships. Plaintiff paid over to the IRS the amount of $47,004.00 in full satisfaction of the federal income tax and deficiency interest due and owing the IRS by plaintiff attributable to the IRS' disallowance of the partnership losses. Plaintiff timely filed a claim for refund with the IRS. As of this date, the IRS has not acted on such claim for refund.

23. Plaintiff Bobby Leach claimed losses from the Picasso and Beta partnerships in the amounts of $60,688.00 and $40,459.00, respectively, on his federal income tax return for the year 1977. The Internal Revenue Service disallowed the losses claimed by plaintiff arising out of the Picasso and Beta partnerships. Plaintiff paid over to the IRS the amount of $25,000.00 in full satisfaction of the federal income tax and deficiency interest due and owing the IRS by plaintiff attributable to the IRS' disallowance of the partnership losses. The plaintiff timely filed a claim for refund with the IRS. As of this date, the IRS has not acted on such claim for refund.

E. Facts Relating to Section 465 Issue

24. Under the terms of the Picasso partnership agreement, each limited partner was personally and on a limited recourse basis liable on the Picasso Note to Pictoo to the extent of 267% of the limited partners' total capital contribution to the partnership. Under this provision, plaintiffs were subject to a potential liability of $160,200.00 in the event that the other parties to this series of transactions were to default on their obligations.

Schedule A of the Non–Negotiable Limited Recourse Installment Promissory Note (the Picasso Note) provides as follows:

SCHEDULE A

PERSONAL OBLIGATIONS OF PARTNERS OF PICASSO EQUIPMENT ASSOCIATES

Each Partner named below is liable for each installment due under the Note to the extent of the "proportionate Share" thereof set forth opposite his name. The liability of each Partner is limited, however, to an aggregate of the amount set forth opposite his name under the caption "Aggregate Obligation" and the liability of each Partner for payment of the installment due pursuant to Section 1(c) of the Note is limited absolutely to the sum set forth opposite his name under the caption "Section 1(c) Obligation". Each Partner's Section 1(c) Obligation shall be reduced by the amount of any payment made by such Partner to Payor due July 1, 1977 (but Payor shall remain liable to transmit such payment to Payee on account of the Note), and each Partner's Aggregate Obligation shall be reduced by the amount of such payment if, but only if, (x) a default in payment of Payor's obligations under the Note (other than a default under Section 1(c)) shall exist at the time such payment is due, (y) a default shall at such time exist in performance of any of Payee's obligations under the Security Agreement and (z) Payor shall notify Payee at the time such payment is made that the Aggregate Obligation is to be so reduced.

25. Except for the potential personal liability of the partners in Picasso referred to in Schedule A, set forth in Paragraph 20 above, there is no enforceable primary obligation of any other party to repay the Picasso Note from which the partners may recover the amounts paid. Pursuant to Section 8(a) of the Picasso Note, the obligation to pay the indebtedness is nonrecourse as against the Picasso partnership or any of its assets other than the Collateral.

Section 8(a) of the Picasso Note provides as follows:

8. *Limited Recourse.*

(a) Except as otherwise expressly provided in paragraphs (b) and (d) of this

Section 8 with respect to certain defaults occurring prior to the "User Rent Achievement Date" (as defined in paragraph (c) of this Section 8), it is a condition of this Note that, in the event of any default by Payor hereunder or under the Security Agreement (i) Payee and its successors and assigns shall look solely to the security under the Security Agreement for the satisfaction of any and all claims and remedies which they may have with respect to this Note and the obligation evidenced hereby, at law or in equity, and (ii) they shall not seek any deficiency or other judgment against Payor, or Payor's heirs, successors or assigns, in the event that such security shall be insufficient to remedy any such default and to pay all of the sums secured under the Security Agreement. The foregoing sentence shall not be construed or interpreted to limit or impair the obligation evidenced by this Note or the right of Payee to procure any judgment to enforce collection under the Security Agreement but only to preclude the enforceability (otherwise than as permitted under paragraphs (b) and (d) of this Section 8) of any claim or judgment with respect to such obligation as against any other asset or otherwise against Payor or any other person.

26. Pursuant to Section 8(b) and (c) of the Picasso Note the personal liability of the Picasso partners, including the plaintiffs, was in effect at all times prior to the "User Rent Achievement Date." After that date, the recourse liability of the Picasso partners is extinguished.

Section 8(b) and (c) of the Picasso Note provides as follows:

(b) Nothing in paragraph (a) of this Section 8 shall be deemed to limit or impair the obligation of Payor, which is absolute and unconditional, to pay to Payee, and the right of Payee to collect from Payor, principal of and interest on this Note, as and when due in accordance with the terms hereof and without regard to (i) provisions hereof limiting the remedies of Payee or (ii) any obligations, express or implied, as to marshaling of assets or liabilities of Payor, except for the following limitations:

(x) payments due under this Note shall be payable and collectible out of other assets of the partners of Payor but only to the extent provided in paragraph (d) of this Section 8 and Schedule A annexed hereto;

(y) from and after the User Rent Achievement Date this paragraph (b) shall be null and void and of no effect and this Note shall be read as though this paragraph (b) had never comprised a part of the terms of this Note.

(c) The User Rent Achievement Date shall be the date on which lessees under User Leases shall have paid, subject to the provisions of this paragraph (c), monthly rental payments due under the terms of the User Leases after the date hereof aggregating $595,970.00. For purposes of this paragraph (c), (i) in the event of any prepayment of rent under a User Lease, whether on termination of a User Lease or otherwise, the amount prepaid shall be treated as received only when and to the extent that the obligation to pay the same accrues or would have accrued under the User Lease with respect to which such prepayment is made and (ii) in the event a new or different User Lease (a "Replacement Lease") shall be substituted for or otherwise replace a User Lease in effect on the date hereof (an "Existing Lease"), then the initial payments of rent under the Replacement Lease shall be treated as a monthly rental payment only to the extent of any rent due and unpaid under the Existing Lease at the time of such replacement, each monthly payment of rent thereafter shall be treated as a monthly rental payment only to the extent of the monthly rental which would then otherwise have been accrued and payable under the Existing Lease, and any excess shall be disregarded in determining the User Rent Achievement Date. Unless Payor shall have received notice from Payee not earlier than February 15, 1978 but not later than February 28, 1978 that the User Rent Achievement Date has not occurred, the User Rent Achievement Date shall be February 28, 1978.

27. The Picasso Note is secured by a Security Agreement, dated December 15, 1976, pursuant to Section 4 of which, upon the occurrence of an Event of Default, the

Secured Party may cause the Collateral (computer equipment) to be sold at a public or private sale and may accelerate the amount of principal due on the Picasso Note to the extent of the net proceeds of the sale of the Collateral. In the event of such acceleration, the Secured party may, prior to the User Rent Achievement Date, enforce the obligation of the Partners to pay the principal amount due.

28. In order to induce Picasso to enter into the purchase and lease transactions with Pictoo and Picwun, respectively, both Pictoo and OPM unconditionally, and on a full recourse basis, guaranteed Picasso and its limited partners the full performance of all obligations of Picwun under the Picasso Lease. Specifically, both Pictoo and OPM unconditionally guaranteed to Picasso, effective as of the date after the User Rent Achievement Date, the prompt and full performance of all the covenants, conditions, and agreements provided in the Agreement of Lease between Picasso and Picwun to be performed by Picwun.

The Guaranty of Lease provides as follows:

In order to induce PICASSO EQUIPMENT ASSOCIATES (the "Lessor"), the owner of the item or items of equipment described on Schedule A hereto, as such Schedule may be amended from time to time, to enter into an agreement of lease of even date herewith (the "Lease") with O.P.M. LEASING/PICWUN, INC. (the "Lessee"), and for other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned, O.P.M. LEASING/PICTOO, INC., a New York corporation having its principal place of business at 99 Wall Street, New York, New York 10005 and O.P.M. LEASING SERVICES, INC., a New York corporation having its principal place of business at 99 Wall Street, New York, New York (collectively the "Guarantors"), do hereby each jointly, severally and unconditionally guarantee to the Lessor, its successors and assigns, the prompt and full performance and observance of all of the covenants, conditions and agreements provided in the Lease to be performed and observed by the Lessee, including, without limitation, the due and prompt payment when due, whether by acceleration or otherwise, in accordance with the terms of the Lease, of rent and all other sums payable by the Lessee to the Lessor, whether absolute or contingent, secured or unsecured, matured or unmatured, and without regard to any grace periods provided for in the Lease, including without limitations, payment of any stipulated loss value, deficiency payments, and all other sums due upon an Event of default by Lessee, including service fees, costs of collection and reasonable attorneys' fees and all sums required as indemnity to Lessor pursuant to and in accordance with the terms of the Lease (such obligations and liabilities of the Lessee being hereinafter collectively referred to as the "Liabilities").

## II.

### Statutory Framework

26 U.S.C. § 465(a)(1)(A) provides, in relevant part, as follows:

IRC § 465. DEDUCTIONS LIMITED TO AMOUNT AT RISK

(a) Limitation to Amount at Risk

(1) In general.—In the case of—

(A) an individual ... engaged in an activity to which this section applies, any loss from such activity shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of section (b)) for such activity at the close of the taxable year.

The amounts for which an individual shall be considered at risk are defined by § 465(b)(1) and (2) as follows:

(1) *In General*—For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including:

(A) the amounts of money and the adjusted basis of other property contributed by the taxpayer to the activity, and

(B) amounts borrowed with respect to such activity (as determined under paragraph (2)).

(2) *Borrowed amounts*—For purposes of this section, a taxpayer shall be consid-

ered at risk with respect to amounts borrowed for use in an activity to the extent that he—

(A) is personally liable for the repayment of such amounts, or

(B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property).

No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

Section 465(b)(4) provides as follows:

(4) Exception.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

Section 465(a) provides that in the case of an individual engaged in an activity to which the section applies, any loss from the activity shall be allowed only for the amount which the taxpayer is at risk at the close of the taxable year. Section 465 applies to post–1975 transactions involving the leasing of any Section 1245 property. Section 465(c)(1)(C). *See Waddell v. Commissioner,* 86 T.C. 848 (1986), *aff'd.,* 841 F.2d 264 (9th Cir.1988). Thus, the at-risk provisions apply to the plaintiffs' participation in Picasso's acquisition of the IBM equipment.

Investors generally are considered to be financially at risk with respect to investments in leasing activities to the extent they contribute money to the activities. Sec. 465(b)(1)(A). Investors also are considered to be financially at risk with respect to debt obligations of leasing activities to the extent they are personally liable for repayment of the debt obligations or to the extent they have pledged property, other than the property used in the activities, as security for the borrowed amounts. Section 465(b)(2).

### III.

#### *Legal Analysis*

█ With respect to debt obligations such as the Picasso Note, investors will be regarded as personally liable for such obligations within the meaning of § 465(b)(2)(A) if they are ultimately economically liable to repay the obligations in the event funds from the investment activities are not available to repay the obligations. The issue of whether a taxpayer is at risk must be resolved on the basis of who realistically will be the payer of last resort if the transaction goes sour and the secured property associated with the transaction is not adequate to pay off the debt. *Emershaw v. Commissioners,* 949 F.2d 841, 845 (6th Cir.1991). The scenario that controls is the worst case scenario, not the best case. The fact that other investors or participants remain in the "chain of liability" does not detract from the at-risk amount of investors who have the ultimate liability. In determining which investors or participants in a transaction are ultimately financially responsible for the debt obligations, the substance of the transaction controls. *Thornock v. Commissioner,* 94 T.C. 439, 448 (1990), *citing Melvin v. Commissioner,* 88 T.C. 63, 75 (1987), *aff'd. per curiam,* 894 F.2d 1072 (9th Cir.1990). Neither the form chosen, the labels used, nor a single feature of the transaction generally will control. *Id.* at 449.

█ Plaintiffs contend that under a worst case scenario they were "at risk" within the meaning of § 465 and therefore entitled to the deduction claimed. Defendant contends that under the structure of the transaction they were not "at risk" under § 465 and that, in any event, were fully protected from loss under § 465(b)(4). I agree with the defendant that plaintiffs were not "at risk" under § 465.

A review of the Picasso–OPM transactions reveals a circular arrangement of off-setting debits and credits lacking any practical economic risk for the plaintiffs. The computer vendor, Pictoo, and the computer lessee, Picwun, have identical ownership, both wholly owned subsidiaries of OPM. OPM sold the computer equipment and assigned its interest in the Blue Cross Lease to Picwun, which also assumed the obligations of OPM with respect to the NBNA Security Agreement. Picwun immediately resold the computer equipment and reassigned the lease to

Pictoo for an amount approximately equal to the original purchase price of the computer equipment. The purchase price was paid in part in a small cash payment, with the balance in a non-recourse promissory note. Pictoo also assumed the obligations which Picwun had previously assumed under the NBNA Security Agreement. Pictoo then immediately resold the computer equipment and reassigned the lease to Picasso, for an amount approximately equal to Pictoo's purchase price for the computer equipment. The purchase price was paid in part in a small cash payment, with the balance in a limited recourse promissory note. Picasso also assumed the obligations which Pictoo had previously assumed under the NBNA Security Agreement. Finally, Picasso then leased the computer equipment back to Picwun for a specified term. Under the Picasso Lease, Picwun was to make monthly rental payments to Picasso in an amount approximately equal to Picasso's obligation to Pictoo under the Picasso Note. In summary, in circular, off-setting transactions, Picwun pays rent under its lease to Picasso, which uses the rent to pay its note to Pictoo, which completes the circle by using the note payment from Picasso to pay its note to Picwun.

Plaintiffs argue that under a worst case scenario Picwun could have gone bankrupt, become insolvent, or simply defaulted on its obligations pursuant to the Picasso Lease, and the plaintiffs would remain personally liable to Pictoo under the Picasso Note. However, as pointed out by the Tax Court under similar facts in *Thornock*, if Picwun had defaulted on its lease obligations (and OPM and Pictoo defaulted under their guaranties to guarantee all obligations of Picwun under the Picasso Lease), Picasso and its limited partners would be able to avoid any obligation to Pictoo because, as a defense, they would point to the failure of OPM and Pictoo to honor their guaranties not to allow Picwun to go into default on the lease payments. *See Thornock,* at 451–52. Because of the relationship between OPM, Picwun and Pictoo, that defense would be effective. *See id.*

Plaintiffs suggest another worst case scenario where OPM, Picwun and Pictoo all go into bankruptcy. Assuming this occurred prior to February 1, 1978, the User Achieve-

ment Date, plaintiffs argue that they could have still been required to make additional capital contributions to the Picasso Partnership. However, in that event, the Picasso Partnership could have then made a claim of set-off based on the Pictoo and OPM guarantees. 11 U.S.C. § 553.

■ Finally, plaintiffs contend that the bankruptcy court might have used its equitable powers to consolidate the theorized bankruptcies of OPM, Picwun and Pictoo and further to disregard the guarantees of Pictoo and OPM. I am not aware of any reason why, in equity, a bankruptcy court would disregard those guarantees. This theorized worst case scenario is complete speculation— there was no realistic possibility that it could ever occur. Thus, plaintiffs' theories depend not only on the bankruptcy of several entities, but several later unusual actions by the bankruptcy judge. It is not sufficient that plaintiffs could conceive of a convoluted set of facts having a miniscule possibility of actually occurring, under which they might be "at risk". Rather, there must have been some realistic possibility that the plaintiffs would be liable on the Note. The transaction was structured here so that there was no such realistic possibility.

The plaintiffs rely on the decision in *Emershaw v. Commissioner,* 949 F.2d 841 (6th Cir.1991). *Emershaw* involved a similar, though less complex sale-leaseback transaction of computer equipment. Under the facts of *Emershaw,* the Sixth Circuit held that the limited partners of a partnership organized for the purpose of purchasing and leasing computers and related equipment were at risk under § 465 on their *pro rata* share of a partial recourse promissory note issued by the limited partnership. The court stated that "we do not consider the circular, off-setting group of obligations at issue here to be, *by itself,* a loss-limiting arrangement within the meaning of § 465(b)(4). The structure of the obligations of the parties to this transaction does not seem to be a loss-limiting device. The parties have arranged their transaction to minimize the need for the LEA partners to provide a great deal of cash 'up front' in order to participate in the pur-

chase and leasing of the computer equipment." *Id.* at 848 (emphasis supplied).

However, there are important distinctions between the transactions in *Emershaw* and those here. The sales of the computer equipment to Picasso were made by OPM through two of its wholly owned subsidiaries, Picwun and Pictoo. Both Pictoo and OPM unconditionally, on a full recourse basis, guaranteed all of Picwun's obligations under the Picasso Lease. Thus, if Picwun failed, for whatever reason, to make its lease payments to Picasso, Picasso would have a defense to any claim Pictoo would have on the Picasso Note. Furthermore, in this case any liability of the limited partners was extinguished on the User Achievement Date, thus shielding the plaintiffs further from any potential liability.

In *Emershaw*, a company known as CIS sold the computer equipment to an unrelated company known as Program, which sold it to LEA, in which the Emershaws were limited partners. LEA then leased the equipment back to CIS. CIS's parent company, Continental, guaranteed CIS's rental payments to LEA. However, there was no guarantee by Program that CIS would make its rental payments under the lease. Thus, if CIS bankrupted, as it did, the LEA partners could still be called upon to pay the partnership note to Program. Thus, the partners remained at risk. In addition, in *Emershaw*, there was no "User Achievement Date" upon which any liability of the limited partners would be extinguished.

Based upon the off-setting nature of the various lease and note payments, the guarantees of OPM and Pictoo with regard to Picwun's lease obligations, and the temporal limitation on the plaintiffs' purported debt obligation, I conclude that there was no realistic possibility that the Picasso partners would ever be ultimately liable to make the payments on the Picasso Note. Realistically, they were simply not at risk with respect to their *pro rata* share of the Note. Unlike *Emershaw*, the structure of the transactions here appears to have been solely a loss-limiting device. Factually, this case is virtually identical to *Thornock* and I agree with the result reached therein.

In light of the foregoing, defendant's motions for summary judgment are granted, plaintiffs' motions for summary judgment are denied, and these cases are dismissed.

Order accordingly.