James V. MARTUCCIO; Louise
A. Martuccio, Petitioners–
Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent–
Appellee.

No. 93–2001.

United States Court of Appeals,
Sixth Circuit.

Argued June 14, 1994.

Decided July 28, 1994.

J. Timothy Bender, Joseph P. Alexander, David G. Lambert (argued and briefed), Kadish & Bender, Cleveland, OH, for petitioners - appellants.

Bruce R. Ellisen, William J. Patton (argued), Gary R. Allen, Acting Chief (briefed), U.S. Dept. of Justice, Appellate Section, Tax Div., Washington, DC, for respondent - appellee.

Before: MILBURN and NELSON, Circuit Judges; and COOK, Chief District Judge.*

MILBURN, Circuit Judge.

The issue in this appeal is whether petitioner James V. Martuccio [1] was "at risk" under 26 U.S.C. § 465 for the recourse portion of an installment note he executed as consideration for the purchase of certain computer equipment. The Tax Court held that he was not. For the reasons that follow, we reverse and remand.

I.

This case involves a sale-leaseback transaction involving three major parties: (1) Tiger Computer, which is a division of National Equipment Rental, Ltd.,[2] a corporation engaged in the business of leasing computer equipment and providing related services;

---

* The Honorable Julian A. Cook, Jr., Chief United States District Judge for the Eastern District of Michigan, sitting by designation.

1. Mr. Martuccio's wife, Louise A. Martuccio, is a party only because they filed joint returns for the years in issue. Therefore, references to "petitioner" are to Mr. Martuccio.

2. We will use "Tiger" to refer to both Tiger and National Equipment.

(2) Elmco, Inc., a corporation that raises equity for leasing companies by arranging equipment leasing transactions with investors seeking tax deferral benefits; and (3) petitioner James V. Martuccio. The subject of the sale-leaseback transaction was certain computer equipment, which Tiger purchased in June 1981. Tiger rented the computer equipment to Consolidated Edison Company of New York, Inc., the "end-user" of the equipment, under a net lease for a term of 48 months.

Tiger financed its purchase of the computer equipment by borrowing funds from Manufacturers Hanover Leasing Corp. (MHLC) under a Loan and Security Agreement dated June 3, 1981. The debt was payable in 48 consecutive monthly installments and was nonrecourse, except that MHLC was authorized to proceed directly against Tiger in the event that any warranty, representation, covenant, or agreement made by Tiger under the Loan and Security Agreement proved to be incorrect or was not performed. Pursuant to the Loan and Security Agreement, MHLC obtained a continuing first priority security interest in the computer equipment and an assignment of the lease between Tiger and ConEd, and all rents and other amounts due thereunder. All rents and other amounts due Tiger under the ConEd lease were to be paid directly to MHLC.

Pursuant to an agreement (the Elmco Purchase Agreement) dated December 21, 1981, Elmco purchased a portion of the computer equipment from Tiger for $472,500, subject to the existing ConEd lease and MHLC's security interest. We will refer to this portion of the computer equipment, which is the subject of this case, as "the equipment." Elmco paid $8,375 in cash on the date of the agreement. The balance of the purchase price was paid with three nonnegotiable, nonrecourse purchase money promissory notes totaling $64,125, and a nonnegotiable, nonrecourse installment note of $400,000. The $400,000 note carried an annual interest rate of 17 percent and was payable over a term of 108 months, commencing January 31, 1982, and ending December 31, 1990. The first 36 payments were $5,666.67 each, and the remaining 72 payments were $8,898.45 each.

An interim payment of $1,889 was due December 31, 1981. Under the note, Tiger was prohibited, even in the event of default by Elmco, from accelerating or otherwise changing the timing or amount of the payments due under the note without the express written consent of Elmco.

Pursuant to an agreement (the Martuccio Purchase Agreement) also dated December 21, 1981, petitioner Martuccio purchased the equipment from Elmco for $500,000, subject to the existing ConEd lease and MHLC's security interest. Petitioner paid $18,000 in cash on the date of the agreement. The balance of the purchase price was paid with three negotiable, recourse purchase money promissory notes totaling $82,000, and a "limited recourse promissory note" for $400,000. The $400,000 note stated that it was recourse only to the extent of $312,896. The payment schedule for this note was the same as the $400,000 installment note Elmco had given Tiger. The note carried an annual interest rate of 17 percent and was payable over a term of 108 months, commencing January 31, 1982, and ending December 31, 1990. The first 36 monthly payments were $5,666.67 each, and the remaining 72 payments were $8,898.45 each. An interim payment of $1,889 was due December 31, 1981.

Concurrent with the purchase of the equipment, petitioner Martuccio executed a lease (the Tiger Lease) of the equipment to Tiger. The term of the lease began December 21, 1981, and ended December 31, 1990, a period of slightly more than 108 months. The lease was a net lease and entitled Tiger to sublease the equipment. The lease required an interim fixed rental payment of $1,889 on December 31, 1981, and rental payments of $5,666.67 for the first 36 months of its term and $9,256.45 per month for the remaining 72 months. The lease also provided that Tiger would share with petitioner a specified percentage of net re-lease proceeds after December 31, 1985.

The purchase agreements and the leaseback agreement contained indemnification clauses. The Elmco Purchase Agreement provided that Tiger would indemnify Elmco for any loss or expense which Elmco might incur because of material breach by Tiger of

any of the warranties, covenants, or obligations set forth in that agreement. The Martuccio Purchase Agreement provided that Elmco would indemnify petitioner Martuccio for any loss or expense which petitioner might incur because of material breach by Elmco of any of the warranties, covenants, or obligations set forth in that agreement. The Tiger Lease gave petitioner the following indemnity protection:

8.4. LOSS OF FEDERAL INCOME TAX BENEFITS—Lessee [Tiger] agrees that it will take no action or position for United States federal income tax purposes inconsistent with or adverse to the ownership of the Equipment by Lessor, [petitioner] it being agreed that (i) the claim by Lessee, after the date hereof, of any deduction for depreciation with respect to the Equipment shall be deemed inconsistent with or adverse to such ownership, and (ii) the attempted grant by Lessee of a purchase option or a security interest or any nonterminable possessory right in the Equipment shall be deemed inconsistent with or adverse to such ownership (it being further understood that any such option, security interest or nonterminable possessory right need not be recognized by Owner); provided that nothing herein shall be deemed to prevent Lessee from assigning its rights to rentals under the End Lease or granting security interests in the Equipment pursuant to assignments and security interest made previous hereto and disclosed to Lessor. Lessee does hereby assume liability for and does hereby agree to indemnify Lessor against any and all liabilities, losses, penalties, costs and expenses, including attorneys' fees and income taxes of Lessor arising from any payment by Lessee under this Section 8.4, imposed upon, asserted against or suffered by Lessor due to any action of Lessee which constitutes an Event of Default under Section 17.1 hereto and which causes the disallowance of Lessor's deduction for depreciation of the Equipment as otherwise provided by Section 167(a) of the Internal Revenue Code of 1954, as amended, or the loss of any other benefits for federal income tax purposes which accrue to Lessor on account of its ownership of the Equipment.

Lessee represents to Lessor that for accounting purposes it will not treat this Lease as a capitalized Lease as that term is used in the Financial Accounting Standards Board Statement of Financial Accounting Standards No. 13.

J.A. 408. The events of default referred to in this provision included Tiger's failure to pay rent under the lease, breach of any provision of the lease, transfer or encumbrance of the equipment, or insolvency. The Tiger Lease also provided petitioner with further indemnification:

Lessee shall indemnify Lessor against, and hold Lessor harmless from, any and all claims, actions, suits, proceedings, costs, expenses, damages, and liabilities, including reasonable attorneys' fees arising out of, connected with, or resulting from the Equipment, including without limitation the manufacture, selection, delivery, possession, use, operation or return of the Equipment; provided that any indemnity for taxes paid by Lessor shall be in accordance with Sections 5.1, 5.2 and 8.4 hereof. Each party agrees that it will give the other prompt notice of the assertion of any such claim or the institution of any such action, suit or proceeding.

J.A. 423.

In addition to the above-described agreements, the parties executed various security agreements. To secure payment of its obligations under the Tiger Lease, Tiger executed a Collateral Lease Assignment, granting petitioner Martuccio a security interest in Tiger's rights in the equipment and Tiger's rights under the lease with ConEd, and any other sublessee, in favor of petitioner. To secure payment of its obligations under the Martuccio Purchase Agreement, petitioner executed a Security Agreement, granting Elmco a security interest in the equipment and petitioner's rights under the Tiger Lease and Collateral Lease Assignment. To secure payment of its obligations under the Elmco Purchase Agreement, Elmco executed a Collateral Assignment, assigning to Tiger its rights under the three purchase money promissory notes executed by petitioner and its right to receive payments under the Tiger Lease. Elmco did not assign the limited

recourse note executed by petitioner. By letters dated December 1, 1981, MHLC agreed that neither Elmco nor petitioner would have personal liability for payment of the amounts due MHLC under the Loan and Security Agreement between Tiger and MHLC or for satisfaction of Tiger's obligations thereunder.

On December 21, 1981, petitioner Martuccio, Elmco, Tiger, and Manufacturers Hanover Trust Company ("Manufacturers") also entered into a Depository Agreement irrevocably appointing Manufacturers the agent for receiving and disbursing funds owed by and between the parties to the transaction. Under the Depository Agreement, payments were made as follows: (a) Rental payments were made by Tiger to an account; (b) petitioner was credited with Tiger's payments; (c) petitioner was debited for payments to Elmco on petitioner's installment note; (d) Elmco was credited for petitioner's installment note payments; (e) Elmco was debited for payments to Tiger on its installment note; and (f) Tiger was credited for Elmco's installment note payments. Petitioner timely paid the $18,000 cash and the three purchase money promissory notes called for under the December 21, 1981, agreement with Elmco.

On August 19, 1985, petitioner consented to Tiger's assignment of all rights and duties relating to the transaction to Franchise Leasing Corporation (Franchise). Subsequently, Tiger went into bankruptcy, but payments on the lease continued to be made, so none of the parties to the transaction went into default.

The payments petitioner received from Tiger or Franchise subsequent to December 1984 exceeded the payments due on the installment note by $358 per month. Petitioner received checks on a monthly or quarterly basis as payment of such differential amounts. Under petitioner's lease with Tiger, petitioner was entitled to receive 50 percent of the net re-lease proceeds for the period January 1986 through December 1988. Petitioner received supplemental rent payments totaling $56,063.86 for such period. Under the lease, petitioner was entitled to receive 70 percent of the net re-lease proceeds for the period January 1989 through December 1990. For the period January 1989 through June 1990, petitioner received supplemental rent payments of $6,905.50.

For the years in issue (1981, 1982, 1983, 1984), petitioner claimed depreciation and interest deductions with respect to the transaction in excess of his reported income with respect to the transaction, thus producing losses.[3] The Commissioner disallowed petitioner's losses insofar as they exceeded $18,000. The Commissioner determined that the only amount with respect to which petitioner was "at risk" in the transaction was the $18,000 in cash petitioner had paid to Elmco for the purchase of the equipment; petitioner was not "at risk" with respect to the $82,000 in recourse purchase money promissory notes or the $400,000 installment note. See 26 U.S.C. § 465 (Deductions Limited to Amount at Risk). Petitioner sought a redetermination of his taxes from the Tax Court. The Tax Court determined that petitioner was "at risk" with respect to the cash and recourse purchase money promissory notes but not with respect to the $400,000 installment note. *Martuccio v. Commissioner*, T.C. Memo 1992–311, 63 T.C.M. (CCH) 3082, 1992 WL 115524 (1992). This timely appeal followed.

## II.

Petitioner challenges the Tax Court's determination that he was not "at risk" with respect to the recourse portion of the $400,000 installment note petitioner gave as consideration for the purchase of the equipment

---

**3.** Petitioner reported the following income and deductions attributable to the transaction:

| | Income | Deductions | | Net Loss |
|---|---|---|---|---|
| | | Interest | Depreciation | |
| 1981 | $ 1,889 | $ 1,889 | $ 75,000 | ($ 75,000) |
| 1982 | 68,000 | 68,000 | 127,500 | ( 127,500) |
| 1983 | 68,000 | 68,000 | 105,000 | ( 105,000) |
| 1984 | 68,000 | 6,800 | 83,300 | ( 22,100) |

from Elmco. We review the Tax Court's findings of fact only for clear error and its findings of law de novo. *E.g., North Amer. Rayon Corp. v. Commissioner,* 12 F.3d 583, 586 (6th Cir.1993). The Tax Court's finding that petitioner was not "at risk" under 26 U.S.C. § 465 with respect to the $400,000 installment note was a finding of law and, therefore, subject to de novo review by this court. *Waters v. Commissioner,* 978 F.2d 1310, 1314 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993).

 Section 465(a)(1) of 26 U.S.C. provides that in the case of individuals engaged in certain activities, including equipment leasing, any loss from such activity for the taxable year shall be allowed only to the extent to which the taxpayer is "at risk" for such activity at the close of the taxable year. Losses disallowed by this provision are carried forward and allowed as losses in succeeding taxable years if the at-risk rules become satisfied. A taxpayer is "at risk" for the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity. 26 U.S.C. § 465(b)(1)(A). A taxpayer is also "at risk" for amounts borrowed with respect to the activity to the extent that he is personally liable for the repayment of such amounts or has pledged property, other than property used in the activity, as security for such borrowed amounts. 26 U.S.C. §§ 465(b)(1)(B) & 465(b)(2). However, "a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." 26 U.S.C. § 465(b)(4).

In the majority of circuits that have addressed the issue, the circular offsetting structure of payments in a three-party sale-leaseback transaction, such as is presented in this case, would be sufficient to trigger the § 465(b)(4) exception from at-risk treatment for notes that will be paid through the circle of payments. *See Waters,* 978 F.2d 1310; *Young v. Commissioner,* 926 F.2d 1083 (11th Cir.1991); *Moser v. Commissioner,* 914 F.2d

1040 (8th Cir.1990); *American Principals Leasing Corp. v. United States,* 904 F.2d 477 (9th Cir.1990). Those courts use an economic reality test to determine if a taxpayer is protected from loss within the meaning of § 465(b)(4). Under that rule, the appropriate inquiry for determining whether § 465(b)(4) takes certain amounts out of the at-risk category is not what theoretically may occur in a worst-case situation, but rather whether "a transaction is structured—by whatever method—to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable." *American Principals,* 904 F.2d at 483. Those courts hold that the matching obligations of the parties to a three-party sale-leaseback transaction effectively immunize the taxpayer in petitioner's position from economic loss, and therefore the taxpayer is protected by a loss-limiting arrangement within the meaning of § 465(b)(4), notwithstanding the possibility that one of the parties might become insolvent and thereby upset the circular flow of payments.

However, the Sixth Circuit has disagreed with the reasoning of those courts and held that the circular offsetting structure of payments in a three-party sale-leaseback transaction, such as is presented in this case, does not by itself trigger § 465(b)(4). *Emershaw v. Commissioner,* 949 F.2d 841, 848 (6th Cir. 1991). The transaction at issue in *Emershaw* was virtually identical to the transaction at issue in the present case. CIS Leasing Corporation bought certain computer equipment, financing the purchase with nonrecourse bank loans, and leased the equipment to end-users. CIS then sold the equipment to Program Leasing Corporation, which gave a small down payment and an installment note for the balance of the purchase price. Program then sold the equipment to LEA, the partnership in which the taxpayer Emershaw was a partner. LEA paid a small down payment and for the balance gave Program a partial recourse installment note equal to the installment note Program had given CIS. LEA then leased the equipment back to CIS

for monthly rent payments equal to the monthly payments LEA owed on its note to Program. The payments on the lease and various notes were made by offsetting book-keeping entries pursuant to letter agreements between the parties. Thus, CIS, Program, and the LEA partners were in the same positions in the *Emershaw* transaction as Tiger, Elmco, and petitioner, respectively, are in for the transaction at issue in the present case.

The *Emershaw* court began its analysis by setting forth the Tax Court's reasoning for holding that Emershaw was "at risk."

> According to the Tax Court, the issue of whether a taxpayer is "at risk" for purposes of 26 U.S.C. § 465(b)(4) "must be resolved on the basis of who realistically will be the payor of last resort if the transaction goes sour...." *Levy v. Commissioner,* 91 T.C. 838, 869 [1988 WL 114910] (1988). The court determined that LEA was the payor of last resort by assuming a "worst case scenario" for purposes of analysis. In this scenario, CIS would go bankrupt, renounce its lease, and stop making rent payments to LEA. Although LEA would have a claim for damages against CIS in such circumstances, the LEA partners, including the Emershaws, would still be required to pay Program the balance of the partial recourse note.... For this reason, the Tax Court determined that LEA, and therewith the Emershaws, was "at risk" for invested sums represented by the partial recourse note issued to Program.

*Id.* at 845. The *Emershaw* court agreed with the Tax Court and determined that the offsetting structure of the payments was not a loss-limiting arrangement within § 465(b)(4) because

> if CIS becomes insolvent because the end-users stop paying rent or for some other reason, the Emershaws and other LEA partners will be called on to satisfy the terms of the partial recourse note. Therefore, their investment is at risk.... We see no reason for dismissing the possible bankruptcy of CIS as a mere theoretical possibility.

*Id.* at 848. The court went on to state that "a loss limiting arrangement within the meaning of § 465(b)(4) is a collateral agreement protecting a taxpayer from loss after the losses have occurred, either by excusing him from his obligation to make good on losses or by compensating him for losses he has sustained." *Id.* at 849. Because the Commissioner had not presented any such collateral agreement, we held that Emershaw was "at risk" for his pro rata share of LEA's partial recourse note.

■ Using the same scenario set forth in *Emershaw,* it is clear that petitioner was "at risk" for the recourse portion of the installment note issued to Elmco. If Tiger goes bankrupt, renounces its lease, and stops making rent payments to petitioner, petitioner would have to expend his own money to pay the monthly payments on the installment note due Elmco, at least to the extent of the recourse portion of the note. As in *Emershaw,* if Tiger becomes insolvent because the end-users stop paying rent or for some other reason, petitioner will be called on to satisfy the terms of the partial recourse note. Therefore, petitioner's investment is at risk.

Recognizing our holding in *Emershaw,* the Commissioner in this case does not rely on the circular structure of the obligations to argue that petitioner is not at risk on the partial recourse note, but rather she argues that the indemnity clause in the Martuccio Purchase Agreement and the nonrecourse nature of Elmco's installment note to Tiger protect petitioner against loss within the meaning of § 465(b)(4). *Emershaw* did not discuss the effect of indemnification clauses, and Program's installment note to CIS was a recourse note.

The Commissioner sets forth a different worst case scenario than that relied on in *Emershaw.* The Commissioner argues that any default by Tiger on its obligations to taxpayer would be accompanied, in the worst case scenario, by the default by Elmco on its note to Tiger. The Commissioner explains that the worst case scenario is not the mere insolvency of Tiger, as evidenced by the fact that the payments continued in this case even though Tiger had actually gone bankrupt. Rather, the proper worst case scenario

is Tiger's insolvency accompanied by the default of ConEd on the end-user lease. In that scenario, the following occurs: ConEd stops paying rent on the end-user lease; Tiger becomes insolvent, fails to find another end-user lessee, fails to pay MHLC out of its own funds, and stops paying rent to petitioner; MHLC then forecloses on and sells the equipment to protect its interests. Since the equipment would have been sold and Elmco's installment note to Tiger was nonrecourse, Elmco would cease paying its installment note because otherwise it would be assuming personal liability on the note, a result Elmco contracted to avoid at the beginning of the transaction.

If Elmco ceased making payments to Tiger, the Commissioner argues, Elmco would have no basis for continuing to collect the installment note from petitioner, and Elmco could not collect on the note without violating the indemnity clause in the Martuccio Purchase Agreement. Thus, the Commissioner contends, even though petitioner would be deprived of his source of payments in the worst case scenario, he would still be protected from personal liability because Elmco would not and could not collect on the installment note from petitioner. The Commissioner concludes that because he would be protected from having to pay the installment note out of his own funds even in the worst case scenario, petitioner is not "at risk" for the amount of the installment note.

The persuasiveness of the Commissioner's argument hinges on the accuracy of the Commissioner's and the Tax Court's opinion that Elmco could not continue to collect the installment note from petitioner if Elmco ceased paying its installment note obligation to Tiger. The Commissioner supports this opinion by arguing that Elmco's breach of its obligations to Tiger would trigger the indemnity clause in the Martuccio Purchase Agreement. That indemnity provision provides:

Seller [Elmco] will indemnify Purchaser [petitioner] and protect, defend and hold [petitioner] harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorneys' fees, wherever and however arising which Purchaser [petitioner] may incur by reason of any material breach by Seller [Elmco] of any of the representations, warranties and covenants or obligations set forth herein, or by reason of the bulk transfer laws of any jurisdiction.

J.A. 357. The Commissioner does not contend that Elmco's failure to pay on its note to Tiger would be a material breach of any of the representations, warranties, and covenants or obligations set forth in the Martuccio Purchase Agreement itself, the only actions to which the indemnity provision facially applies. Rather, the Commissioner asserts that Elmco's breach of its obligations to Tiger under the Elmco Purchase Agreement should trigger the indemnity provision in the Martuccio Purchase Agreement, notwithstanding that the indemnity provision states that it only applies to breaches of the Martuccio Purchase Agreement. In other words, the Commissioner wants to treat all of the agreements relating to the sale-leaseback transaction as one three-party contract and then treat a breach by Elmco of any part of that comprehensive contract, even as to duties owed to Tiger only, as a breach entitling petitioner to indemnification.

■ The Commissioner's one-contract theory finds no support in the law of New York, which the parties chose as the law governing the various agreements involved in the sale-leaseback transaction, nor in any general contract doctrine of which we are aware. Courts applying New York law have construed facially separate agreements between the same parties as one contract for the purpose of determining the intended meaning of the agreements; see *Dynamics Corp. v. International Harvester Co.*, 429 F.Supp. 341, 345–46 (S.D.N.Y.1977) (holding that agreement for sale of truck producing plant and agreement for purchase of trucks between the same parties must be read as one agreement for determining whether the general contracts statute of limitations or the commercial code statute of limitations was applicable, i.e., was the contract for the sale of goods); *Nau v. Vulcan Rail & Construction Co.*, 286 N.Y. 188, 36 N.E.2d 106 (1941) (determining proper construction of one contract between the parties by referring to

another contract between the parties); but the New York courts have not construed contracts between separate parties relating to the same transaction as mutually dependent, i.e., performance of contract between A and B conditioned on the performance of contract between B and C, in the absence of a manifest expression of the parties' intent to that effect, *see Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 330 N.Y.S.2d 33, 42, 280 N.E.2d 867, 873–874 (1972). "Although form is not conclusive, that the parties entered into separate written agreements with 'separate assents' rather than a 'single assent' is influential," and where "the agreements involved formally different parties, ... the conclusion of separateness becomes all but inescapable." *Id.*

In this case, petitioner's obligations to Elmco were contained in a contract that obviously required a separate assent from the contract between Elmco and Tiger because the two contracts involved different parties. In such a situation, and in light of the fact that the contracts do not expressly make performance of one conditional on performance of the other, the separateness of the contracts is "all but inescapable." Thus, petitioner would not be relieved of his duty to pay Elmco on the partial recourse installment note by Elmco's failure to pay Tiger on its installment note. Furthermore, because the indemnity provision in the Martuccio Purchase Agreement only entitles petitioner to indemnification from Elmco in the event that Elmco breaches that agreement, petitioner would not be entitled to indemnification or offset for Elmco's breach of its separate agreement with Tiger. Therefore, the indemnification clause does not protect petitioner from loss within the meaning of § 465(b)(4) even under the worst case scenario posited by the Commissioner.

The Commissioner also argues that if Elmco ceased payment to Tiger, petitioner would be able to avoid payment of its obligation to Elmco under the partial recourse installment note on the grounds that Elmco would be unjustly enriched by petitioner's payments. However, by demanding payment of the partial recourse installment note, Elmco would be doing no more than exercising rights that

it was granted by the plain terms of the Martuccio Purchase Agreement and the partial recourse installment note. "[U]nless fraud, mistake, or the like is set up, a court of equity will not disturb contract rights as evidenced by a writing which purports to express the intention or will of the parties to the agreement." 27 Am.Jur.2d *Equity* § 71 (1966) (footnotes omitted); *accord Graf v. Hope Bldg. Corp.*, 254 N.Y. 1, 171 N.E. 884, 885 (1930); *see Apfel v. Prudential–Bache Securities Inc.*, 81 N.Y.2d 470, 600 N.Y.S.2d 436, 616 N.E.2d 1095, 1099 (1993) (dismissing claim based on unjust enrichment because "the transaction is controlled by the express agreement of the parties"). The Commissioner does not contend that petitioner's indebtedness to Elmco was a result of fraud, mistake, or the like. Therefore, we cannot conclude that petitioner would be relieved of his duty to pay Elmco on the basis of an "unjust enrichment defense."

In conclusion, the Commissioner has not distinguished the present transaction from the transaction at issue in *Emershaw*. The nonrecourse nature of Elmco's obligation to Tiger does not protect taxpayer from loss because even if Elmco stops paying Tiger, Elmco could still enforce taxpayer's obligations to Elmco under the partial recourse installment note. Furthermore, the indemnification clause in the Martuccio Purchase Agreement would not protect taxpayer from liability to Elmco even though Elmco's obligations to Tiger would be extinguished. Elmco's breach of its agreement with Tiger would not trigger the indemnification clause in the Martuccio Purchase Agreement because Elmco's failure to pay Tiger would not be a breach of the Martuccio Purchase Agreement. Thus, the Commissioner has not shown that petitioner is protected from loss by an arrangement falling within § 465(b)(4), and accordingly, following the reasoning of *Emershaw*, we hold that petitioner is "at risk" within the meaning of § 465 for the recourse portion of his installment note to Elmco.

### III.

For the reasons stated, the decision of the Tax Court holding that petitioner was not at

risk for the recourse portion of his installment note to Elmco is REVERSED, and this case is REMANDED to the Tax Court for a redetermination of petitioner's tax liability consistent with this opinion.