T.C. Memo. 1997-512

UNITED STATES TAX COURT

WILLIAM AND ARLENE G. KINGSTON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15409-95.                    Filed November 17, 1997.

William and Arlene G. Kingston, <u>pro se</u>.

<u>Elizabeth P. Flores</u>, for respondent.


MEMORANDUM OPINION

WELLS, <u>Judge</u>:  This case was assigned to Special Trial Judge
D. Irvin Couvillion pursuant to section 7443A(b)(4) and Rules
180, 181, and 183.[1]  The Court agrees with and adopts the opinion
of the Special Trial Judge, which is set forth below.

---

[1]   Unless otherwise indicated, section references are to the
Internal Revenue Code in effect for the years at issue.  All Rule
references are to the Tax Court Rules of Practice and Procedure.

OPINION OF THE SPECIAL TRIAL JUDGE

COUVILLION, Special Trial Judge: In separate notices of deficiency, respondent determined the following deficiencies and additions to tax against petitioners for the years indicated:

| | | Additions to Tax | | |
| | | Sec. | Sec. | Sec. |
| Year | Deficiency | 6653(a)(1) | 6653(a)(2) | 6661 |
| 1985 | $ 6,293 | $ 314 | * | $1,573 |
| 1986 | 10,186 | [1]509 | *[1] | 2,546 |

[*]50 percent of the interest due on the underpayment attributable to negligence.
[1]These additions to tax, for 1986, are under sec. 6653(a)(1)(A) and (B).

Respondent also determined increased interest, under section 6621(c), for each of the years at issue.

The issues for decision are: (1) Whether respondent timely issued the aforementioned notices of deficiency to petitioners, and, if so, (2) whether petitioner William Kingston (petitioner) was "protected against loss" within the meaning of section 465(b)(4) with respect to his pro rata share of partnership debt obligations arising from sale-leaseback transactions engaged in by a partnership, and (3) whether petitioners are liable for the additions to tax under sections 6653(a) and 6661(a) and the increased interest under section 6621(c).

Some of the facts were stipulated, and those facts, with the annexed exhibits, are so found and are incorporated herein by reference. At the time the petition was filed, petitioners' legal residence was West Bloomfield, Michigan.

Petitioners filed joint Federal income tax returns for 1985 and 1986.  On their returns, petitioners claimed deductions of loss and investment interest expense (the claimed deductions) relating to Hambrose Leasing 1985-3 (the partnership) in the following amounts:

| Year | Loss | Investment Interest Expense |
|------|------|-----------------------------|
| 1985 | $13,903 | $1,082 |
| 1986 | 21,538 | 2,190 |

This case involves two sale-leaseback transactions among the following entities:  CIS Leasing Corp. (CIS), a New York corporation with principal offices in Syracuse, New York; Comdisco, Inc. (Comdisco), a Delaware corporation with principal offices in Rosemont, Illinois; Charterhouse Leasing Associates Limited Partnership (Charterhouse), a Connecticut limited partnership; Hambrose Reserve Ltd. (Hambrose), a Delaware corporation; M & J Holding Corp. (M & J), a Delaware corporation that was the sole shareholder of Hambrose and the general partner of Charterhouse; and Hambrose Leasing 1985-3 (the partnership), a partnership engaged in the equipment leasing business.

The Sale-Leaseback Transactions

The transactions can be described in general terms as follows:  CIS and Comdisco purchased IBM computer equipment with a specified amount of borrowed funds.  CIS and Comdisco then leased the computer equipment to various end users.  CIS and Comdisco then sold the computer equipment to Charterhouse,

subject to the original financing and user leases.  Charterhouse then sold the equipment to Hambrose, subject to the original financing and user leases.  Hambrose then simultaneously leased the equipment back to Charterhouse.  Hambrose then sold the equipment to the partnership, subject to the original financing and user leases, and also assigned to the partnership all rights under the equipment lease between Hambrose and Charterhouse. Upon completion of all of the transactions, the partnership owned the computers, the end user companies used them, and Charterhouse, Hambrose, and the partnership traded streams of financing payments and lease payments.

The Initial Equipment

CIS financed, on a nonrecourse basis, the purchase of certain IBM computer equipment (the Initial Equipment), for a total purchase price of $1,196,254.74.[2]  The purchase was financed through four different third party lenders, and all of the Initial Equipment was leased by CIS to four different actual end users of the equipment.  Charterhouse then paid CIS an aggregate purchase price of $474,415 for the Initial Equipment, $18,978 of which was paid in cash, and the balance of $455,437

---

[2]     The parties stipulated that the $1,196,254.74 represented the total amount financed through third party lenders for the purchase of the Initial Equipment.  Since there is no indication from the record that any cash, or other funds, was paid to acquire the Initial Equipment, the Court surmises that the total amount financed represented the total purchase price of the Initial Equipment.

being represented by various installment notes, which were nonrecourse obligations of Charterhouse and were secured by the Initial Equipment.

On or about March 29, 1985, Hambrose purchased the Initial Equipment from Charterhouse for $474,415, subject to the liens of the original third-party lenders, the original purchaser, and the end user leases. This $474,415 purchase price was payable as follows: $23,000 in cash on May 8, 1985, and $451,415 by an unsecured installment note. Concurrent with Hambrose's purchase of the Initial Equipment from Charterhouse, Hambrose leased back the Initial Equipment to Charterhouse pursuant to the terms of a wrap lease (Initial Equipment Wrap Lease), which provided for fixed rent, payable in four consecutive annual installment payments of $153,212 each, with the first payment due on March 31, 1986.

On or about March 29, 1985, the partnership purchased the Initial Equipment from Hambrose for $474,415 subject to all the liens of the original third-party lenders, a lien on and security interest in the Initial Equipment in favor of Hambrose, and subject to the user leases and the Initial Equipment Wrap Lease. This $474,415 purchase price was payable as follows: $1,000 in cash on the closing in October 1985; $27,000 in cash on or before December 31, 1985; and a $446,415 promissory note (secured by the Initial Equipment) that was payable in four consecutive annual

installment payments of $153,212 each, with the first payment due on March 31, 1986. This note was nonrecourse as to the partnership.[3] In conjunction with the partnership's purchase of the Initial Equipment, Hambrose assigned to the partnership the Initial Equipment Wrap Lease, as a result of which the four consecutive annual rent payments of $153,212 each would be paid to the partnership by Charterhouse.

The Additional Equipment

CIS and Comdisco financed, on a nonrecourse basis, the purchase of certain additional IBM computer equipment (the Additional Equipment) for a total purchase price of $18,019,633.11.[4] They financed the purchase of this Additional Equipment through six different third-party lenders and leased the Additional Equipment to six different end users. Charterhouse purchased the Additional Equipment from CIS and Comdisco in two separate purchase transactions, one each for the Additional Equipment under each user lease. The total purchase price for all the Additional Equipment was $15,643,832, of which

---

[3]    Hambrose Leasing v. Commissioner, 99 T.C. 298, 301, 312 (1992).

[4]    The parties stipulated that this $18,019,633.11 represented the total amount financed through third party lenders for the purchase of the Additional Equipment. Since there is no indication from the record that any cash, or other funds, was paid to acquire the Additional Equipment, the Court surmises that the total amount financed represented the total purchase price of the Additional Equipment.

$1,183,487 was paid in cash and $14,460,345 by various installment notes.[5]  These installment notes were nonrecourse obligations as to Charterhouse.

Hambrose then purchased the Additional Equipment from Charterhouse for $15,420,834, subject to all other liens and leases, including the liens of the original third-party lenders, CIS, Comdisco, and the user leases.[6]  The $15,420,834 purchase price was payable by $1,400,000 in cash and the remaining $14,020,834 by an installment note, bearing 13.17722 percent interest per annum, and payable in seven annual installments of principal and interest as follows:

| Year | Amount |
|------|--------|
| 1986 | $   570,167 |
| 1987 | 3,421,004 |
| 1988 | 3,421,004 |
| 1989 | 3,421,004 |
| 1990 | 3,421,004 |
| 1991 | 3,421,004 |
| 1992 | 3,421,004 |

Concurrent with Hambrose's purchase of the Additional Equipment from Charterhouse, Hambrose leased the Additional Equipment back to Charterhouse pursuant to a wrap lease (Additional Equipment Wrap Lease).

---

[5]    The difference between the total purchase price for Charterhouse and the amount of CIS's and Comdisco's financing is not explained in the record.

[6]    Hambrose purchased the Additional Equipment pursuant to a purchase commitment given by it to Charterhouse earlier in the year.

The purchase agreement between Hambrose and Charterhouse contained the following provision for indemnification:

6. Indemnification.
Seller [Charterhouse] will indemnify Purchaser [Hambrose] and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorney's fees, wheresoever and howsoever arising which Purchaser or its subsidiaries or stockholders, or any of its, or their, directors, officers, agents, employees, stockholders or partners, may incur by reason of any material breach by Seller of any of the representations by, or obligations of, Seller set forth in this Agreement or by reason of the Bulk Sales Laws of any jurisdiction. * * *

The Additional Equipment Wrap Lease contained the following provision for indemnification:

18. Indemnification
18.1 Lessee [Charterhouse] will indemnify Lessor [Hambrose] and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorneys' fees, wheresoever and howsoever arising which Lessor or its subsidiaries or shareholders, or any of its or their directors, officers, agents, employees, stockholders or partners, may incur by reason of any breach by Lessee of any of the representations by, or obligations of, Lessee contained in this Lease or in any way relating to or arising out of this Lease; the Equipment, claims of holders of the Lien or Underlying Leases; * * *

The Additional Equipment Wrap Lease also stated that Charterhouse's obligation to pay "all rental charges payable" under the Additional Equipment Wrap Lease would be "absolute and unconditional under all circumstances." Furthermore, under the Additional Equipment Wrap Lease, Charterhouse (the lessee) waived "any right of set-off under state or federal law, counterclaim, recoupment, defense or other right which Lessee may have against

Lessor or anyone else for any reason whatsoever".  The annual fixed rental payments due Hambrose from Charterhouse under the Additional Equipment Wrap Lease were identical to the installment payments due Charterhouse from Hambrose under the installment note described above.[7]

Immediately following the purchase of the Additional Equipment by Hambrose, the partnership purchased the Additional Equipment from Hambrose for $15,420,834, subject to all other liens and leases, including those of the original third-party lenders, the original purchasers, Hambrose and Charterhouse, and subject to the Additional Equipment Wrap Lease, the original purchaser leases, and the end-user leases.  The $15,420,834 purchase price was paid by $1,542,083 in cash, and the remaining $13,878,751 by a Limited Recourse Installment Promissory Note (Limited Recourse Note), which was secured by the Additional Equipment, bears a 14-percent per annum interest and payable in eight installments with the first installment of $921,917 due at the time of closing.  The remaining installment payments were due as follows:

---

[7]    The figures for these rental payments listed on the Additional Equipment Wrap Lease submitted into evidence differ slightly from those figures listed in the Stipulation of Facts signed by the parties.  However, since the exact amount of these figures is not pertinent to our determination of the issues in this case, the Court hereby accepts the figures listed in the Stipulation of Facts signed and submitted by the parties.

| Year | Amount[8] |
|------|-----------|
| 1986 | $  570,167 |
| 1987 | 3,421,004 |
| 1988 | 3,421,004 |
| 1989 | 3,421,004 |
| 1990 | 3,421,004 |
| 1991 | 3,421,004 |
| 1992 | 3,421,004 |

The Limited Recourse Note contained the following deferral provision:

5. Deferral, etc.
    5.1 Deferral.  Maker [the partnership] shall have the right to defer payment of the Principal Amount and interest as the same becomes due under this Note if and to the extent any amount of rent or other sums due to Maker under an agreement of even date (the "Lease"), between * * * [Charterhouse], as lessee, and Maker, as lessor is not received by Maker as the same becomes due (the "Past Due Sum").  The amount of principal and interest so deferred will become due and payable at such time as, and to the extent that, Maker receives from Charterhouse the Past Due Sum; provided, however, that no interest shall accrue on the principal and interest payments so deferred; provided, further, however, that the amount of interest and principal so deferred shall become due and payable on Jan. 1, 1992; whether or not Maker shall have received the Past Due Sum on or before such date.

---

[8]    The figures for the payments listed on the Limited Recourse Note submitted into evidence differ slightly from those figures listed in the Stipulation of Facts signed by the parties. However, since the exact amount of these figures will not be pertinent to our determination of the issues in this case, the Court hereby accepts the figures listed in the Stipulation of Facts signed and submitted to the parties.

The Limited Recourse Note provided further that the partnership's obligation under such note, and each limited partner's assumed personal liability thereunder, would be "absolute and unconditional under all circumstances."  Further, in the Limited Recourse Note, the partnership waived "any right of set-off under state or federal law, counterclaim, recoupment, defense or other right which the [partnership] may have against [Hambrose] or anyone else for any reason whatsoever".

The Purchase Agreement and Assignment of Right between the partnership and Hambrose (Purchase Agreement) for the Additional Equipment contained the identical "absolute obligation" and set-off waiver provisions as the Limited Recourse Note.  The Purchase Agreement also contained an indemnification provision nearly identical to that contained in the Additional Equipment Wrap Lease (i.e., Hambrose indemnifying the partnership for loss resulting from Hambrose's breach of any provision of the Purchase Agreement).

Both the Limited Recourse Note and the Purchase Agreement required each of the limited partners to severally, and not jointly, assume personal liability for his or her pro rata portion of the Limited Recourse Note that was equal to $114,578 per partnership unit for each limited partner.  Also, the Limited Recourse Note and the Purchase Agreement both provided that all payments made on the Limited Recourse Note would first be applied

to that portion of the amounts due for which no partner had personal liability. In other words, in the event that the Limited Recourse Note was not paid in full by the partnership, any remaining unpaid portion of such note would be that for which the partners had assumed personal liability. Under such circumstances, the partners would be called upon to pay their pro rata share of the unpaid amounts due on the Limited Recourse Note.

Pursuant to the provisions of the Purchase Agreement, the Additional Equipment Wrap Lease was assigned to the partnership by Hambrose. Consequently, the rental payments under the Additional Equipment Wrap Lease were paid by Charterhouse directly to the partnership.

The Partnership

The partnership was organized in March 1985, under the laws of the State of Connecticut, to engage in the equipment leasing business. Investments in the partnership were offered through a private offering memorandum (POM). The partnership offered 70 units of partnership interests at a price of $40,000 per unit. The purchase price was payable in full in cash on subscription or payable $9,200 cash and the balance payable by two Investor Notes in the amount of $15,400 each, bearing 12-percent interest (payable annually). The principal of each of these Investor

Notes was due February 3, 1986, and February 2, 1987, respectively.

As a condition of becoming a limited partner, an investor was also required to assume recourse debt of $114,578 per partnership unit purchased, which represented his or her proportionate share of the Limited Recourse Note executed by the partnership in connection with the purchase of the Additional Equipment from Hambrose. The subscription agreement included the following provision:

> (c) The Subscriber [petitioner] understands that pursuant to the Partnership Agreement, * * * he is agreeing to be personally liable for his proportionate share of the Partnership Equipment Note [Limited Recourse Note] to Hambrose Reserve Ltd. ("Hambrose Reserve") and interest thereon equal to $114,578 per Unit. Such personal liability gives Hambrose Reserve the right, at maturity, to pursue a Limited Partner directly for the amount of the unpaid balance of his pro rata share of the portion of the Partnership Equipment Note for which the Limited Partners are personally liable. The liability of each Limited Partner is several and not joint. The Subscriber further understands that the portion of principal and interest on the Partnership Equipment Notes for which the Limited Partners are personally liable will not be paid until after the nonrecourse portion of principal and interest thereon has been paid in full.

In other words, Hambrose had the right to pursue a limited partner directly for the amount of the unpaid balance of his or her pro rata share of the assumed portion of the Limited Recourse Note at maturity, which could extend to as late as January 1, 1992 (if the deferral provisions in the Limited Recourse Note

applied; otherwise a limited partner's liability would apply as each installment of the Limited Recourse Note became due).

Petitioner's Decision To Invest

On November 1, 1985, petitioner executed subscription documents to purchase one-half of one unit in the partnership, for which he paid a total of $20,000 cash over the period from November 1985 through June 1987.[9]  Pursuant thereto, petitioner was required to, and did, therefore, assume personal liability for his pro rata portion of the Limited Recourse Note in the amount of $57,289.

Procedural Background

Respondent issued two Notices of Final Partnership Administrative Adjustment (the FPAA's) to the partnership for the tax years 1985 and 1986 on April 20, 1992.  On July 17, 1992, the partnership filed a petition with this Court challenging the correctness of the FPAA, but making no claim that it was not timely.  That case was captioned Hambrose Leasing v. Commissioner, under docket No. 16262-92 (Hambrose II).

On September 1, 1992, this Court issued its opinion in a related case, pertaining to the 1984 tax year, Hambrose Leasing v. Commissioner, 99 T.C.  298 (1992) (Hambrose I).  In Hambrose I, this Court held that the issue of whether a partner is at risk

---

[9]     Petitioner paid $4,600 cash on Nov. 1, 1985, and signed an Investor Note in the amount of $15,400, which he paid on over the following 2 years.

under section 465 must be decided in a partner-level proceeding, not in a partnership-level proceeding. In that opinion, the Court also decided that, for purposes of any subsequent litigation involving the partnership, the installment note for the Additional Equipment was nonrecourse as to the partnership. Id. at 303, 312. The decision in that case was entered on September 24, 1992, and became final on December 23, 1992.

On October 6, 1993, this Court granted respondent's "Motion to Dismiss for Lack of Jurisdiction as to I.R.C. Section 465 and To Strike" in Hambrose II, and all references to the "at risk" issue were, therefore, stricken from the pleadings. On May 27, 1994, this Court entered a decision in Hambrose II based on a stipulated settlement agreement under Rule 248(a) in which respondent accepted as filed the partnership items for the taxable years 1985 and 1986 of the partnership. This decision became final on August 25, 1994.

On May 19, 1995, respondent issued statutory notices of deficiency to petitioners, one for the 1985 tax year and one for the 1986 tax year, in which the claimed deductions for 1985 and 1986 with respect to the partnership were disallowed, and additions to tax and increased interest were asserted.

Untimely Notice

The first issue for decision is whether respondent timely issued notices of deficiency to petitioners in this case.

Section 6229(a) provides that respondent has 3 years from the date of the filing of the partnership return in which to assess the tax based on any partnership or "affected" item.[10] If an FPAA is issued before the end of the 3-year period of limitations of section 6229(a), that period is suspended for the time during which a partnership-level proceeding may be brought and if such a proceeding is timely brought, until a decision in that proceeding becomes final, and for 1 year thereafter. Sec. 6229(d). Sections 7481 and 7483 provide generally that a decision of this Court becomes final, in the absence of a timely filed notice of appeal, 90 days from the date the decision is entered. Since, in the instant case, it is undisputed that the applicable limitations period was open when two FPAA's were issued to the partnership, and that the partnership timely filed a petition in this Court based on such FPAA's, the period of limitation for issuing notices of deficiency was suspended, under section 6229(d), for 1 year after the decision in the partnership proceeding before this Court became final.

The parties agree that the period of limitation for issuing notices of deficiency for affected items is suspended for 90 days plus 1 year following the entry of the decision in the partnership proceeding. The parties disagree, however, as to the

_____

[10] Consistent with this Court's decision in Hambrose Leasing v. Commissioner, 99 T.C. 298 (1992), the deductions at issue are "affected" items.

date upon which the decision was entered in the partnership proceeding.

Respondent contends that the decision in the partnership proceeding was entered on May 27, 1994, when this Court entered the decision based on the stipulated settlement agreement. Respondent contends further that this decision became final on August 25, 1994, which is 90 days following entry of the decision. Therefore, respondent argues, under section 6229(d), the period of limitation was suspended until August 25, 1995, which is 1 year from the date the decision became final. Since the subject notices of deficiency were issued on May 19, 1995, respondent argues that the deficiency notices were timely issued.

Petitioners contend that the decision in the partnership proceeding was entered on October 6, 1993, the date this Court granted respondent's motion to dismiss for lack of jurisdiction with respect to the at-risk issue under section 465. Petitioners argue further that this decision became final on January 4, 1994, which is 90 days following the entry of such "decision". Therefore, petitioners argue, under section 6229(d), the period of limitation was suspended only until January 4, 1995, which is 1 year from the date the "decision" became final. Since the relevant notices of deficiency were not issued until May 19, 1995, petitioners argue that the notices were not timely issued.

In support of their position, petitioners rely on section 7459(c) and the case of <u>Armstrong v. Commissioner</u>, T.C. Memo. 1992-328, affd. 15 F.3d 970 (10th Cir. 1994), for the proposition that a dismissal for lack of jurisdiction is tantamount to a decision of this Court.  Section 7459(c) provides:

> (c) Date of Decision.--A decision of the Tax Court (except a decision dismissing a proceeding for lack of jurisdiction) shall be held to be rendered upon the date that an order specifying the amount of the deficiency is entered in the records of the Tax Court or, in the case of a declaratory judgment proceeding under part IV of this subchapter, or under section 7428 or in the case of an action brought under section 6226 or section 6228(a), the date of the court's order entering the decision.  If the Tax Court dismisses a proceeding for reasons other than lack of jurisdiction and is unable from the record to determine the amount of the deficiency determined by the Secretary, or <u>if the Tax Court dismisses a proceeding for lack of jurisdiction, an order to that effect shall be entered in the records of the Tax Court, and the decision of the Tax Court shall be held to be rendered upon the date of such entry</u>.  [Emphasis added.]

Indeed, in Hambrose II, this Court did grant a motion to dismiss for lack of jurisdiction, but only as to a single issue in the case, not as to the entire proceeding.  By granting the motion to dismiss for lack of jurisdiction with respect to the at-risk issue under section 465, this Court did not dismiss the entire partnership proceeding but, rather, dismissed only that portion of the proceeding that related to the at-risk issues under section 465.  Consequently, under section 7459(c), a decision in Hambrose II was not rendered on October 6, 1993, the date the Court granted respondent's motion to dismiss for lack of

jurisdiction with respect to the at-risk issue.  On the contrary, the decision in Hambrose II was rendered on May 27, 1994, the date this Court entered a decision based on the stipulated settlement agreement.  Furthermore, petitioners' reliance on the case of Armstrong v. Commissioner, supra, is misplaced because the Court in that case dismissed a petition; i.e., an entire proceeding, for lack of jurisdiction.  Petitioners' argument on this issue is without merit.

On this record, the Court holds that a decision was entered in the partnership proceeding on May 27, 1994, which decision subsequently became final on August 25, 1994.[11]  The Court holds further that the notices of deficiency were timely issued to petitioners under section 6229(a) because the notices were mailed on May 19, 1995, which was within 1 year after the decision in the partnership proceeding became final.

At-Risk

The second issue for decision is whether petitioner was "protected against loss" within the meaning of section 465(b)(4) with respect to his pro rata share of the Limited Recourse Note,

---

[11]    A stipulated decision, though generally not subject to appeal except on jurisdictional grounds, Clapp v. Commissioner, 875 F.2d 1396 (9th Cir. 1989), is still considered a reviewable decision that becomes final 90 days after entry of decision. Pesko v. United States, 918 F.2d 1581 (Fed. Cir. 1990); Sherry Frontenac, Inc. v. United States, 868 F.2d 420 (11th Cir. 1989); Security Indus. Ins. Co. v. United States, 830 F.2d 581 (5th Cir. 1987) (all cited in Ripley v. Commissioner, 105 T.C. 358, 362 (1995), revd. on other grounds 103 F.3d 332 (4th Cir. 1996)).

for which he assumed personal liability.  Since respondent first raised this issue in the answer, respondent bears the burden of proof.  Rule 142(a).

Section 465(a) provides that deductions with respect to liabilities of the type involved in this case are allowable only to the extent the taxpayer is "at risk".  A taxpayer's amount at risk includes the amount of money and the basis of property contributed to an activity.  Sec. 465(b)(1)(A).  Also, a taxpayer is considered at risk for amounts borrowed with respect to the activity.  Sec. 465(b)(1)(B).  The statute defines amounts borrowed with respect to an activity as including "amounts borrowed for use in an activity to the extent that * * * [the taxpayer] is personally liable for the repayment of such amounts".  Sec. 465(b)(2)(A).

Respondent agrees that the partnership's sale-leaseback transactions had a business purpose with economic substance, were engaged in for profit, and that the partnership's equipment was correctly valued.  Respondent further agrees that petitioner was "at risk" in the amount of his $20,000 investment, which consisted of $4,600 cash and the $15,400 Investor Note that petitioner executed upon purchasing his interest in the partnership, and for which he was personally liable.

Respondent also agrees that petitioner assumed a pro rata share of the Limited Recourse Note.  Respondent contends,

however, that petitioner was not at risk for his pro rata share of the Limited Recourse Note as to which he assumed personal liability because of section 465(b)(4). Section 465(b)(4) provides:

> (4) Exception.--Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

Respondent does not contend that petitioner was protected from loss by guarantees or stop loss agreements. However, respondent argues that petitioner was protected from loss by nonrecourse financing and "other similar arrangements", as provided in section 465(b)(4).

In determining whether a taxpayer is protected from loss within the meaning of section 465(b)(4), the majority of Courts of Appeals that have addressed this issue have applied the "realistic possibility" or "economic reality" test. See Waters v. Commissioner, 978 F.2d 1310 (2d Cir. 1992), affg. T.C. Memo. 1991-462; Young v. Commissioner, 926 F.2d 1083 (11th Cir. 1991), affg. T.C. Memo. 1988-440 and Cohen v. Commissioner, T.C. Memo. 1988-525; Moser v. Commissioner, 914 F.2d 1040 (8th Cir. 1990), affg. T.C. Memo. 1989-142; American Principals Leasing Corp. v. United States, 904 F.2d 477 (9th Cir. 1990) (sometimes cited as Baldwin v. United States). Under the economic reality test, the courts examine whether "a transaction is structured--by whatever

method--to remove any realistic possibility that the taxpayer will suffer an economic loss if the transaction turns out to be unprofitable." American Principals Leasing Corp. v. United States, 904 F.2d at 483. The economic reality test was applied by this Court in Levien v. Commissioner, 103 T.C. 120, 126 (1994), affd. without published opinion 77 F.3d 497 (11th Cir. 1996).

However, the Court of Appeals for the Sixth Circuit, to which an appeal in this case would lie, has disagreed with the majority of circuits and has adopted a "worst-case scenario" test for the determination of whether a taxpayer is protected from loss within the meaning of section 465(b)(4). See Martuccio v. Commissioner, 30 F.3d 743 (6th Cir. 1994), revg. T.C. Memo. 1992-311; Emershaw v. Commissioner, 949 F.2d 841 (6th Cir. 1991), affg. T.C. Memo. 1990-246. Under the "Golsen rule", "where the Court of Appeals to which appeal lies has already passed upon the issue before us, efficient and harmonious judicial administration calls for us to follow the decision of that court." Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). The Court of Appeals for the Sixth Circuit has spoken definitively on the "at-risk" issue as it relates to this case. Consequently, in the instant case, this Court is bound to apply the "worst-case scenario" standard in determining whether

petitioners were protected from loss within the meaning of section 465(b)(4).

Respondent acknowledges, on brief, that no single feature of a transaction controls as to whether a taxpayer is protected from loss. However, respondent contends that, in this case, a combination of factors, including the nonrecourse nature of the indebtedness involved in the transaction, the circularity of payments, and the deferral provisions in the Limited Recourse Note, effectively protected petitioner from loss within the meaning of section 465(b)(4).

The Court first examines respondent's assertion that the existence of nonrecourse financing protected petitioner from loss under section 465(b)(4). Where a partner is personally liable for his share of partnership nonrecourse debt by virtue of his assumption of the nonrecourse liability, the presence of that same nonrecourse liability cannot also be said to be a factor insulating him from risk. See Hayes v. Commissioner, T.C. Memo. 1995-151; Wag-A-Bag Inc. v. Commissioner, T.C. Memo. 1992-581, and cases cited therein.

Respondent next asserts that the circular nature of the payments, i.e., the fact that the partnership's debt payments under the Limited Recourse Note were exactly offset by the rental payments it received from Charterhouse, protected petitioner from loss. The circularity of the payments is set forth in the

stipulation and the stipulated documents as well as in the POM.
The Court of Appeals for the Sixth Circuit has observed that such
a structure:

> minimizes the need for a large initial cash outlay by any of
> the * * * partners.  It does not minimize the risk that "the
> taxpayer will suffer any out-of-pocket loss if the
> transaction is unsuccessful."  * * *  The circle of
> offsetting obligations does nothing to affect this risk, let
> alone eliminate it, realistically, probably, or otherwise.
> * * *  [Emershaw v. Commissioner, 949 F.2d 841, 850 (6th
> Cir. 1991); affg. T.C. Memo. 1990-246.]

Finally, respondent argues that the various provisions for
indemnification contained in the Purchase Agreement and the
Additional Equipment Wrap Lease protected petitioner from loss
under section 465(b)(4).  Upon analyzing an indemnification
provision in a purchase agreement that parallels that of the
Purchase Agreement in the instant case, the Court of Appeals held
that such an indemnification clause did not protect the
petitioner from loss within the meaning of section 465(b)(4).
Martuccio v. Commissioner, 30 F.3d 743, 751 (6th Cir. 1994),
revg. T.C. Memo. 1992-311.

The sale-leaseback transactions in issue in Emershaw v.
Commissioner, supra, and Martuccio v. Commissioner, supra, are
indistinguishable from the transaction in issue in the instant
case.  In Emershaw v. Commissioner, supra, CIS purchased certain
computer equipment, financing the purchase with nonrecourse bank
loans, and leased the equipment to end-users.  CIS then sold the
equipment to Program Leasing Corporation (Program), which gave a

small downpayment and an installment note for the balance of the purchase price. Program then sold the equipment to LEA, the partnership in which the taxpayer Emershaw was a partner. LEA paid a small downpayment and for the balance gave Program a partial recourse installment note equal to the installment note Program had given CIS. LEA then leased the equipment back to CIS for monthly rent payments equal to the monthly payments LEA owed on its note to Program. The payments on the lease and various notes were made by offsetting bookkeeping entries pursuant to letter agreements between the parties.

In Martuccio v. Commissioner, supra, the principals, Tiger, Elmco, and the taxpayer, Martuccio, were in the same positions, respectively, as CIS, Program, and the LEA partners were in the Emershaw transaction. The principals in both of those cases paralleled the principals CIS, Comdisco, Charterhouse, Hambrose, the partnership, and petitioner in the instant case.

In Emershaw v. Commissioner, supra, the Court of Appeals for the Sixth Circuit held, as discussed previously, that the circular offsetting structure of payments in the three-party sale-leaseback transaction, similar to that presented in this case, did not by itself constitute protection from loss under section 465(b)(4). Emershaw v. Commissioner, 949 F.2d at 848. Upon examining the similar sale-leaseback transaction in issue in Martuccio v. Commissioner, supra, the Court of Appeals for the

Sixth Circuit held that, under the "worst-case scenario" standard, neither the existence of an indemnification clause in the taxpayer's purchase agreement nor the nonrecourse nature of the note to the original purchaser of the equipment protected the taxpayer from loss within the meaning of section 465(b)(4). Respondent has failed to present facts in this case that would distinguish the transaction in the instant case from those in Emershaw v. Commissioner, supra, and Martuccio v. Commissioner, supra. Therefore, the reasoning applied, and results reached in those cases equally apply to the instant case.

On this record, under the standards prescribed by the Court of Appeals for the Sixth Circuit, the Court here holds that petitioner is not "protected from loss" within the meaning of section 465(b)(4). Petitioners are, therefore, entitled to the loss and investment interest expense deductions claimed on their 1985 and 1986 Federal income tax returns. Petitioners are sustained on this issue.

Additions

The remaining issue is whether petitioners are liable for the additions to tax under sections 6653(a) and 6661(a), and the increased interest under section 6621(c), for each of the years in question. Since the Court holds for petitioners on the at risk issue, there exists no underpayment to which the additions

to tax under sections 6653(a) and 6661(a), and the increased interest under section 6621(c) may be applied.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioners.</u>